UNITED STATES, Appellee

v

CLARENCE H. SICLEY, Ship's Serviceman Third Class, U. S. Navy, Appellant

6 USCMA 402, 20 CMR 118

No. 6037

Decided September 23, 1955

*Roger H. Harper, Esq.*, argued the cause for Appellant, Accused. With him on the brief was *Commander James A. Brough*, USN.

*Lieutenant (jg) Mitchell W. Rabbino*, USNR, argued the cause for Appellee, United States. With him on the brief were *Lieutenant Commander M. M. Seydel*, USN, and *Captain E. B. White, Jr.*, USMC.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

Tried by a Navy general court-martial under two specifications alleging the making and the presentation of a false claim, in violation of the Uniform Code of Military Justice, Article 132, 50 USC § 726, and one of larceny, in violation of Article 121, 50 USC § 715, the accused who is before us here was found not guilty of the crimes alleged in the first two specifications, but was convicted of larceny. These findings, together with the sentence to receive a bad-conduct discharge from the service, were subsequently approved by the convening authority and affirmed by a divided board of review in the office of The Judge Advocate General. Alleged inaccuracies in the instructions supplied by the law officer prompted us to grant the accused's timely petition for review.

II

After his marriage in June of 1951, the petitioner—who was stationed in Bayonne, New Jersey—received orders directing him to report to San Diego, California, on or before October 10, 1951. Because of Mrs. Sicley's pregnancy, Sicley accomplished the trip alone with the understanding that she would join him on the west coast at a later date. Domestic difficulties developed, however, and in January 1952, he received two letters from his wife

—then residing in Petersburg, New York—which indicated that she had developed a marked disinterest in continuing their marriage.

Alarmed at this turn of events, the accused applied for and received emergency leave from January 10 to January 27, 1952, during which period he traveled to New York, where he appears to have convinced his reluctant spouse that she should live with him at his California post. He then returned to California—he said—under the distinct impression that his wife would join him in the immediate future. Thereafter, he rented a furnished apartment near his duty station, and later requested an acquaintance—a disbursing clerk—to draft a claim which would entitle him to payment for his wife's travel. On February 2, 1952, the appellant signed the voucher prepared for him—in which he certified that his wife had departed from Petersburg, New York, on September 23, 1951, and arrived at San Diego, California, on October 17 of the same year. That journey, however, was not made by Mrs. Sicley at any time.

Approximately one year later, Sicley received a letter from an attorney in Troy, New York, requesting written authorization to appear in the former's behalf in divorce proceedings which had been instituted by his wife. The mar-

**405**

riage was dissolved subsequently by a decree of divorce, which became final on October 10, 1953. The accused had not earlier refunded to the Government any part of the sum collected by him for the travel of his wife—and late in 1953 an amount equal to the spurious claim was deducted from his pay.

In explanation of his action in filing the false claim he had set in motion, the accused testified that he had inquired into the meaning of the dates September 23, 1951, and October 17, 1951, which appeared on the document's face, but was told that this recitation amounted to no more than "office routine." Moreover, noting that the form he had signed contained a statement requiring the claimant to certify that the claim represented the entire travel of all dependents which has been or *will be* performed, he made no further inquiry and affixed his signature to the voucher. He felt justified in doing this —he said—for the reason that friends had informed him that dependents' travel funds might lawfully be drawn in advance. The accused concluded his testimony by insisting that, despite receipt of notice of the pending divorce proceedings, he had at no time lost hope that his wife would join him in California.

After instructing the members of the court-martial with respect to applicable law, the law officer gave the following additional instruction at the request of defense counsel:

"The court is advised that a person who takes, obtains, or withholds the property of another, believing honestly and reasonably, although mistakenly, that he has a legal right to acquire or retain the property, is not guilty of an offense in violation of Article 121, which is the offense charged under Charge II and the specification thereunder, the larceny charge."

Thereupon, a member of the court inquired:

". . . If we assume that this was an honest and reasonable mistake, although mistaken on the dates alleged, that is, with regard to Charge II, Specification 1, on °2 February 1952, but if we believe at a later date an intent to permanently deprive the Government was then entertained, does this supply the requisite intent for the theft?"

In answering this question affirmatively, the law officer quoted the language of paragraph 200a(6), Manual for Courts-Martial, United States, 1951, which provides in part:

". . . Although a person has acquired possession of property by a taking or obtaining which was not wrongful, or which was without the concurrence of an intent to steal, he nevertheless can commit a larceny of the property if after the taking or obtaining he forms an intent to steal it and wrongfully withholds it with that intent."

It is on this last instruction that the accused bottoms his claim of prejudicial error.

### III

Appellate defense counsel have urged before us that the court-martial was flatly misinformed with respect to the theory on which the case was prosecuted. Thus—we are told—the quoted Manual provision, relating to the commission of larceny through the formation of an intent to steal subsequent to a lawful taking, applies only to a situation in which the recipient of property acquired it for a limited purpose—for example, where one lawfully rents a motor vehicle and thereafter forms an intent to steal it. Although the accused was tried under a specification alleging that he stole the funds in question on February 2, 1952, the instruction, relying on the Manual provision set out above, permitted the court-martial to convict him of larceny following a finding that he had formed the intent to steal at a later date—thereby allowing the members of the court to relate the criminal intent back to the time of acquisition.

The defense insists that this was erroneous under the general rule running to the effect that no sort of crime is committed in the absence of a guilty intent existing at the time of the unlawful action complained of. In addi-

tion, appellate defense counsel point out that the court-martial exonerated the accused under both charges alleging that he had made and had presented a false claim on February 2, 1952. It is thus reasonable to assume—it is urged—that the findings of guilty of larceny were based not on an unlawful taking effected on February 2, but rather on the view that the accused acquired the necessary intent subsequently, and thereafter wrongfully withheld funds which he had acquired lawfully. Such a finding would necessarily require evidence indicating that the proceeds received by the accused on February 2, 1952, remained within his control at the time the later intent was formed. Since the existence of a *res* susceptible of a wrongful withholding was not established—the argument concludes—the law officer's instruction permitted the court-martial to convict on the basis of a theory unsupported by the evidence.

We are entirely willing to accept so much of the defense position as asserts that, if a crime is to be ▌ made out, a *mens rea* must accompany the unlawful act. Certainly, substantial authority supports the view that, at common law, a taking and a *concurrent* intent are essential ingredients of the crime of larceny. Clark and Marshall, Law of Crimes, 5th ed, page 432; Miller, Criminal Law, 1934, page 369, 387. Whether this rule should be applied without qualification to every charge of larceny brought under Article 121 of the Code we are not required to decide. It is sufficient to say that, for the purposes of this decision, we will assume the soundness of this view.

We hesitate, however, to acquiesce in the defense's insistence that, by finding the accused not guilty of ▌ the making and the presentation of a false claim, the court-martial, in effect, accepted his plea of mistake and as a result, found the taking of the money to have been an innocent one. Where three counts of an indictment are supported by the same evidence, a finding of not guilty as to two does not necessarily demand that the accused be exonerated as to the

third. Dunn v United States, 284 US 390, 76 L ed 356, 52 S Ct 189, 80 ALR 161; see Steckler v United States, 7 F 2d 59 (CA2d Cir).

Certainly, we cannot hold that—if reversal is required—the inconsistency relied on by the defense necessitates a dismissal of the remaining charge rather than a rehearing. Nevertheless, for the purpose of determining the theory on which the case was tried, it is reasonable to resolve doubts in favor of the accused, and to assume that the defense hypothesis is correct. Especially is this true in view of the fact that a court member had inquired specifically whether the alleged theft might be established through the birth of a later evil intent, although the accused had labored under an honest and reasonable mistake in acquiring the property. Therefore, our analysis begins with the premise that on February 2, 1952, the accused received the sum of $189.50 from the United States Government believing in good faith that he was entitled thereto, whereas payment of that amount to him was in fact unauthorized.

IV

Article 121 of the Uniform Code provides in pertinent part:

"(*a*) Any person subject to this code who wrongfully . . . withholds, by any means whatever, from the possession of the true owner . . . any money . . .

"(1) with intent permanently . . . to appropriate the same to his own use . . . steals such property and is guilty of larceny."

Under the plain language of the statute it can be argued that the offense of larceny is made out by the facts of this case—that is, that Sicley withheld a sum of money from the Government with intent permanently to appropriate it to his own use. However, appellate defense counsel insist that, if the view be taken that the petitioner was convicted under this theory, then the law of embezzlement applies and requires a showing either that he occupied the position of a fiduciary prior to the conversion, or that he held within his con-

**407**

trol a *res* susceptible of theft at the time the wrongful intent was formed. Since neither condition was established —it is argued—reversal is required. In order to treat this contention fully and fairly, it is necessary that we examine both the specification and the sufficiency of the evidence thereunder, together with portions of the law officer's instructions.

The specification under which the accused was tried alleged—in keeping with the appropriate Manual form—that he "did . . . steal" the sum indicated, property of the United States Government. That this language sufficiently apprised him of the nature of the crime charged, and provided him with adequate protection against further prosecution for the same offense, cannot seriously be questioned. See United States v Aldridge, 2 USCMA 330, 8 CMR 130. Thus by sanctioning a specification alleging merely that the accused "did . . . steal" something of value, the property of another, the framers of the Manual, in accordance with the express intent of Congress, acted to abolish prior technical distinctions in pleading the crimes of larceny, embezzlement, and taking by false pretenses. Under such a specification, therefore, the Government may prove any one of the acts proscribed by the Article. Manual for Courts-Martial, supra, paragraph 200a, page 357. Accordingly, we can find no defect in the specification before us.

In assessing the sufficiency of the evidence, we are asked to apply what is said to be the Federal rule —that is, one providing that embezzlement is established by proof that the property involved came lawfully into a defendant's possession under circumstances which served to create a fiduciary relation between him and its owner, and that thereafter there eventuated a breach of trust or a wrongful appropriation or conversion of that property to the defendant's use. Weinhandler v United States, 20 F2d 359 (CA2d Cir) ; Moore v United States, 160 US 268. We observe, however, that both of these cases deal with the sufficiency

of indictments under the legislation which immediately preceded Section 641, Title 18, USC, and proscribed the *embezzlement* of property of the United States.

Within the meaning of that statute, it would appear that an indictment for embezzlement must allege, and the evidence must establish, either that the money unlawfully withheld from the Government came into the accused's possession by virtue of his position as an employee or fiduciary, or that certain property identified with particularity was the subject of the embezzlement. Moore v United States, supra; United States v Renton, 52 F Supp 961 (D NJ). However, it does not necessarily follow that such requirements exist as to the allegations or proof of larceny in violation of Article 121 of the Code. Our problem then is to decide whether the technical rules which formerly characterized the crimes of larceny, embezzlement, and taking by false pretenses— rules eliminated from court-martial pleading through codification—should nevertheless be perpetuated in determining the sufficiency of the evidence.

If Article 121 had been drafted in terms of "larceny," "embezzlement," or "false pretenses," we would strongly incline toward a holding that the Government must, in a case like the one before us, establish either the existence of a fiduciary relationship between the accused and the United States, or must show that the *particular* money involved —the sum of $189.50 in this instance— was in fact withheld from its rightful owner. Our statute, however, makes punishable, *inter alia,* conduct amounting to no more than a withholding from the possession of the true owner of something of value with an intention permanently to appropriate it. Moreover, the Manual for Courts-Martial merely provides that such a withholding may arise either (1) because of a failure to account for property belonging to another where an accounting is due, or (2) as a result of having devoted property to a use not authorized by its owner. Paragraph 200a, supra. Nowhere does the Code, or the Manual, suggest that proof of a fiduciary rela-

408

tionship, or the establishment or a *res*, is essential to a conviction for larceny.

Unfortunately, confusion has arisen in the State of New York, in which there is to be found larceny legislation quite similar in phrasing to Article 121. Although larceny may be alleged there in general terms, and in a manner substantially identical to that provided by the Manual for Courts-Martial, the courts of that State have exhibited more than a little reluctance to depart from traditional modes of thought. For example, in People v Felber, 34 NYS2d 609, the Appellate Division observed that certain city sales tax proceeds collected by a corporation from its customers were within the corporation's custody as "bailee," "agent" or "trustee," and that an appropriation of these funds by corporate officials to their own use fell within the statutory definition of larceny, as found in Section 1290 of the New York Penal Law.

This case is significant because of the New York court's emphasis on the relationship between the corporation and those doing business with it with respect to tax receipts. Although the pertinent statute did not at all require such a showing, the Felber decision seems to read into its terms the necessity for establishing the existence of a fiduciary position occupied by the accused—that is, where the offense charged would, under prior law, have been characterized as embezzlement. Such a trend seems to us clearly to defeat the very purpose of codification. If pre-existing technicalities are to be perpetuated through judicial affection therefor, a statute advisedly couched in general terms will be of no avail, and the path of reform legislation will be rendered thorny. In any event, we are wholly free from amenability to New York precedents, and experience no slightest hesitation in resolving the present problem in accordance with Congressional intent, and in keeping with the standards provided by the framers of the Manual—regardless of civilian case law to the contrary.

V

In order that the present situation may be brought within the language of the Manual, the accused ▪ must either have been under a duty to return, account for, or deliver the money he received as reimbursement for his wife's travel, or he must have devoted the sum to an unauthorized use. Was he under such a duty or did he use the funds improperly? Necessarily, a determination of these questions turns on a construction of the Joint Travel Regulations for the uniformed services.

Paragraph 7003-1 of these Regulations provides that a member of the military service who elects to move his dependents at his own expense is entitled to a monetary allowance in lieu of transportation as to all travel performed within the United States, regardless of the mode of travel utilized. This monetary allowance is payable *after* the travel of the dependents has been completed, and it is not payable in advance. Paragraph 7003-2. However, we find nothing in the mentioned Regulations which requires the recipient of such an allowance to account for it, or to apply the money to a particular use. Indeed, a member of an Armed Force is authorized to receive his own travel pay *in advance,* and in some circumstances is entitled to such an allowance although the travel is not in fact accomplished. Joint Travel Regulations, paragraph 1100-1, 4156, case 7. Thus, it appears that the accused, on receiving the monetary allowance he claimed, held it as his own—this despite the fact that his wife at no time performed the travel for which the sum was allotted.

It must be remembered, of course, that he was not entitled to the allowance at all—but we have nevertheless been required to assume that the court-martial found him to have been honestly and reasonably mistaken at the time he filed a claim therefor. This has become the law of the present case. Thus, he became indebted to the United States in the sum of $189.50, and unquestionably could have been compelled to return that amount in a civil action on a theory of unjust enrichment. It will be recalled that the Government, in fact, had recovered this figure by means of a payroll deduction prior to the

institution of the present prosecution. However, as we understand the meaning of the term "withhold," a debtor does not withhold specific property from the possession of his creditor merely by failing or refusing to pay a debt—and thus he cannot be guilty of larceny as a result of conduct of this nature. Manual for Courts-Martial, supra, page 357.[1]

Our reasoning may be followed more easily, we believe, if—by way of illustration—we assume that the accused had received payment in advance for travel he himself was required to perform. Since the Travel Regulations permit such a procedure, can it be said that he is guilty of larceny for the reason that he had squandered all of it in riotous living? We are sure that the answer must be in the negative—for there is no requirement that the allowance advanced be used to finance the journey, nor must the recipient account for it in any manner. We find no reason—and none has been suggested—why a different result should obtain in a situation in which an accused has received an allowance for dependents' travel in advance, mistakenly believing that the payment was authorized.

In this connection, it may be said further that the accused here is in much the same position as a member of one of the uniformed services who has received a basic allowance for quarters. Such a payment is made to individuals entitled to basic pay free from any sort of requirement that the sum allotted be accounted for by the recipient. See 37 USC § 252; Executive Order No. 10204, 16 FR 417. For example, if one receives a quarters allowance of $100.00 per month, but resides in an apartment costing only $50.00, he is under no slightest obligation to return or account for the difference.

In order that our decision be not misinterpreted, we must observe that—as we reason—the unlawful act here, if any, occurred at the time the accused filed the claim in question. If he had then falsely represented that his wife had performed the travel in question without an honest belief in the propriety of his conduct, larceny is established without doubt. Manual for Courts-Martial, supra, paragraph 200a, page 359. As we have observed, however, because of (1) the court-martial's findings of not guilty under the making and presentation specifications, (2) the inquiries by a member of the court concerning the accused's defense of mistake of fact, and (3) the law officer's instruction which injected a theory of withholding into the case, we cannot conclude with assurance that the accused was found to have *obtained* the money unlawfully. In such a setting, we have no choice but to resolve doubts in his favor. The risk that he was found guilty of having *withheld* property of the United States wrongfully, in the face of a complete failure of essential evidence to support this theory, directs us inescapably toward a holding that the conviction cannot stand.

## VI

Since our disposition of the case will require a redetermination of the issues at trial level, we are prompted to comment on the law officer's instruction with respect to the accused's alleged mistake. In essence, the court-martial's judge informed the members of that body that one who obtains the property of another, honestly *and reasonably* believing that he enjoys a legal right

---

[1] It must be remembered that under the decisions of this Court—notably the Aldridge case, cited earlier herein and in the dissenting opinion as well—Article 121 created no offense not theretofore known to military law. Instead, its provisions simply merged three existing crimes—larceny, embezzlement and taking by false pretenses—and, at the same time, abolished certain common law technicalities applicable to one or some of them. There is certainly nothing to be found either in the statute itself or in the Congressional hearings, which suggests any sort of purpose to provide a legislative basis for imprisonment for debt. No decision of this Court can be said to have expressed or implied such a view, and the Manual, on page 357, provides explicitly that "A debtor does not *withhold* specific property from the possession of his creditor by failing or refusing to pay a debt." (Emphasis supplied.)

thereto, is not guilty of larceny. We have previously held a similar instruction to be erroneous on the theory that —where properly raised—the issue of mistake of fact should be submitted to the court-martial in terms of *honest* belief, regardless of the degree of care exhibited by the accused. United States v Rowan, 4 USCMA 430, 16 CMR 4. It would seem that the instruction before us suffers from the Rowan infirmity. The difficulty we experience in accepting this conclusion immediately, however, lies in the peculiar situation with which we are confronted here.

First among the accused's contentions is his asserted belief that he was entitled to collect in advance for dependents' travel. Under current travel regulations, however, payment of this character is completely unauthorized. It is at once apparent that the accused's defense of mistake is—in this regard, at least—not a mistake of fact, but one of law. Moreover, the accused concedes that he falsely represented that his wife had performed the travel for which he sought reimbursement. Obviously then, there can be no claim of mistake, either honest or reasonable, as to *this* fact— for the accused admittedly knew that the travel had not been performed. Based on his original mistake of law, however—that is, the impression that reimbursement might legally be obtained in advance for travel to be performed by the dependent subsequently —the accused insisted that at all times he honestly believed that his wife would make the trip to California. This last contention fairly raised an issue in the nature of mistake of fact.

We are thus faced with the following complex and unusual situation. (1) A known false representation, (2) resulting in the payment of a sum of money to an accused, (3) who has expressed a belief that he was entitled thereto if a certain event occurs subsequently, and (4) who insists further that he honestly believed that the mentioned event would occur. Obviously, the crux of the problem is the accused's mistaken impression that payment for dependents' travel in advance was authorized. Unless this issue is to be resolved in the accused's favor, the question of whether he honestly believed that his wife would later perform the travel involved is immaterial. Thus, we address ourselves to the question of whether an honest mistake of *law* may —in this setting—negate the inference of an intent permanently to deprive the Government of property, an inference which arises from having obtained the sum of $189.50 by means of a false representation.

Recognition of the defense of mistake of law is found in the Manual for Courts-Martial, supra, paragraph 154(a)(4), which provides in pertinent part:

"As a general rule, ignorance of law, or of regulations or directives of a general nature having the force of law, is not an excuse for a criminal act. *However, if a special state of mind on the part of the accused, such as a specific intent,* constitutes an essential element of the offense charged, an honest and reasonable mistake of law, including an honest and reasonable mistake as to the legal effect of known facts, may be shown for the purpose of indicating the absence of such a state of mind." [Emphasis supplied.]

This statement of the rule constitutes a summary of numerous common law decisions, which—although they employ varying terminology—seem predicated on the notion that one may, under certain circumstances, (1) err in the application of a rule of law to a particular situation, (2) reach an incorrect conclusion as to his rights, and (3) thereafter commit an act proscribed as criminal, yet (4) may do so quite without the necessary felonious intent. See Clark and Marshall, Law of Crimes, supra, § 63. Conceding the existence of authority to the contrary, we nevertheless expressly adopt the view that the defense of mistake of law as contemplated above is available to one accused of crime in the military establishment. Our purpose now is to determine whether the preceding Manual language squares with previous holdings of this Court in the area of mistake of *fact*.

In United States v Rowan, supra, we

observed that one who acquires property in the honest belief ▮▮▮▮▮▮ ▮ that he is entitled thereto has not exhibited the criminal intent necessary to establish larceny. Thus we rejected the view that an accused may avail himself of the defense of mistake of fact in a larceny case only if the honest mistake was based on reasonable grounds. The Manual provision now under discussion is couched in substantially similar language, and it contains the phrase, "an honest *and reasonable* mistake of law." (Emphasis supplied.) We are sure that the objection voiced in Rowan applies as well to the requirement of care laid down by the Manual with respect to the defense of mistake of law. Any other result would appear to be both illogical and unjust. For example, in the Rowan case, the accused testified that he executed the checks in question while laboring under the honest belief that a banking account to cover them had been opened in his name. In fact, no such account had been established. Since the accused's conduct would have been lawful had the facts been as he believed them to be, we held that the defense of mistake of fact should have been tested by use of the yardstick of honesty only.

Let us suppose, however, that in the Rowan case the accused had known that no checking account had yet been opened in his name, but had honestly believed that banking regulations permitted the cashing of checks, provided the drawer subsequently opens an account to cover them. Let us assume further that such regulations in fact *specifically* provide against the cashing of checks in the absence of a prior deposit in a checking account. In this hypothetical situation, is not the accused's mental attitude in its bearing on specific intent identical with that found in the case decided? True, his defense has become one of mistake of law, but his actions would have been legal nonetheless if the situation had been as he honestly believed it to be. In both settings—the actual and the imaginary—the accused's testimony, if believed, would negate the criminal intent necessary to sustain a conviction

of larceny. Therefore, we hold that one accused of larceny who contends that he had acted under an honest claim of right in obtaining the property allegedly stolen is entitled to have that defense—whether it be one of mistake of law or of fact—submitted to the court-martial in terms of honest misconception alone.

Civilian authority of considerable weight supports the above analysis. One writer notes:

"When . . . a person does an act under an erroneous idea of a situation reached by applying law to facts, if the act done would not be criminal provided the situation were as he believed it, the defendant should have a good defense. He is in the same position, so far as his state of mind is concerned, as though the situation regarding which he was mistaken were one solely of fact." [Keedy, Ignorance and Mistake in the Criminal Law, 22 Harvard Law Review, 75, 91.]

In Cutter v State, 36 NJL 125, where the defendant, a justice of the peace, was indicted under a statute proscribing the taking of unauthorized fees under color of office, the court, in upholding the accused's claim of honest mistake of law, observed at page 127:

". . . Whenever a special mental condition constitutes a part of the offence charged, and such condition depends on the question whether or not the culprit had certain knowledge with respect to matters of law, in every such case it has been declared that the subject of the existence of such knowledge is open to inquiry, as a fact to be found by the jury. This doctrine has often been applied to the offence of larceny. The criminal intent, which is an essential part of that crime, involves a knowledge that the property taken belongs to another; but even when all the facts are known to the accused and so the right to the property is a mere question of law, still he will make good his defence if he can show, in a satisfactory manner, that being under a misapprehension as to his legal rights, he *honestly* believed the

412

articles in question to be his own." [Emphasis supplied.]

Moreover, one who acquires property in good faith, under fair color of claim or title, *honestly* believing that he is its owner and enjoys a right to its possession, or that he was entitled to take it, is not guilty of larceny despite the fact that he is mistaken in this belief—this for the reason that in such a case the felonious intent is wanting. 32 Am Jur, Larceny, § 41. We are sure, therefore, that our prior observations rest on firm ground.

One further problem remains. Is the accused's defense of honest mistake of law dissipated by reason of the fact that he had obtained the sum in question by means of a known false representation? We are sure that a negative response to this question must be furnished. The fact that the taker employs a trick to obtain what he honestly believes he owns, or is entitled to take, does not necessarily alter the rule relating to the defense of honest mistake. 32 Am Jur, supra, § 41. Moreover, the Manual provides that the false pretense must be an effective and *intentional* cause of obtaining the property in question. Manual, supra, paragraph 200a(5). If Sicley's testimony is believed—as appears to have been the case here—a court-martial could reasonably find that he acquiesced in the false statement contained in the travel voucher, not at all to induce payment, but merely to satisfy the requirements of "office routine." Certainly, then, he did not *intend* that his false representation would *cause* the issuance of the Government check. In fact, he consistently asserted that in his own mind he honestly believed himself entitled to the allowance in advance of the performance of the wife's travel.

One with only limited service experience can attest to the reliance almost inevitably placed on the efficiency of finance office personnel in matters involving the payment of travel and other allowances. In a typical situation, the payee does little more than sign the voucher prepared by the disbursing unit after a hurried glance at its contents. Without at all condoning such a practice, we are required to note that it is widespread, and that the probability of false assertions appearing in travel vouchers is doubtless high. By affixing his signature to an instrument containing an incorrect representation, the payee certainly charges himself with knowledge of its contents—but at the same time he is not without right to seek to establish the absence of a fraudulent intent. We cannot say, therefore, that the presence of a knowingly false statement demands a finding of guilty of larceny on a rehearing of the present case, notwithstanding the accused's defense of honest mistake.

## VII

We have expressed our views at length in an attempt to clarify the issues which should be presented on rehearing. Since we have been unable to determine with exactness the rationale of the findings of the court-martial with respect to the larceny charge, we suggest the desirability of a finding of fact—through the use of instructions—with respect to whether the accused effectively and intentionally caused the issuance of the check for dependents' travel by means of a knowing false representation. If he defends once more on the ground that he signed the voucher while laboring under a misapprehension, that defense—if reasonably raised—must be submitted in terms of honest mistake. An instruction to the effect that one who obtains the property of another, believing *honestly,* although mistakenly, that he possesses a legal right thereto, has not formed the requisite larcenous intent, and cannot be found guilty of that offense, will suffice to bring the issue into bold relief. With this guide before it, a subsequent court-martial will be able to determine beyond reasonable doubt whether the accused committed the crime with which he is charged.

For the reasons stated, the decision of the board of review is reversed and a rehearing ordered.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

**413**

For a number of reasons I have not been able to follow satisfactorily the concepts set forth in the majority opinion. However, I will not belabor this dissent by discussing all of my areas of disagreement as two or three points of departure will suffice. First, it seems to me that my associates overrule the principles we announced in United States v Aldridge, 2 USCMA 330, 8 CMR 130. In that case we discussed instructions on specifications alleging violations of Article 121 of the Uniform Code of Military Justice, 50 USC § 715 (larceny), and Judge Brosman, speaking for the Court, had this to say:

"An examination of the legislative history of Article 121 discloses that it was the clear intent of Congress to create the single offense of 'larceny' and to abolish the technical distinctions theretofore existing among the crimes of larceny, embezzlement, and taking under false pretenses. Hearings before House Committee on Armed Services, 81st Congress, 1st Session, on H. R. 2498, at pages 815 and 1232. Thus, the particular means of acquisition of the property became relatively unimportant, and the critical question in each case now is the intent with which the property in question is held by the accused. If the accused intended permanently to deprive or defraud the person entitled to possession of the property of its use and benefit, or if he intended permanently to appropriate the property to his own use, or to the use of one not entitled thereto, he has stolen it in law and is guilty of larceny. . . .

"The concededly tortuous course of this analysis is, we think, rather due to the inartful wording of Article 121, supra, than to deficiencies in ourselves. However, we do not sit in judgment on the phrasing of Congressional intent. It is simply our task to interpret and apply that phrasing and to serve that intent. Basically, the Article in question requires proof of no more than two elements: (1) that the accused obtained possession of the property in question, of some

value, (2) with an intent, then or thereafter conceived, permanently to deprive the true owner of its use and benefit. The eclecticism expressed in the Article as to each of these elements is calculated merely to afford alternative means of establishing what we have discerned to be the essential and basic elements."

After pointing up the difference between the variations of the crime of desertion based on separate and distinct intents, and larceny, based on the single intent to deprive the owner permanently of his property, the author Judge went on to state (page 332):

"No such precise instructional specificity need be required in the instance of the crime charged in the case at bar, for the reason that there is but one offense of larceny. By the president's instructions here— certainly no more inartful than the statute upon which they were based— the members of the court were required to find that accused had acquired possession of the sums of money specified, from the individuals named, and had intended permanently to deprive the rightful owners thereof. That is all that is demanded by the law. We, therefore, hold that there was no error in the instructions of the president in this particular."

Under the rule of this case, it now appears that we have revived all the technical instructional niceties which plagued the courts before larceny, false pretenses, and embezzlement were merged into one offense. I make the foregoing observation for the reason that the facts of this case permitted the court-martial to find a false pretense, a wrongful obtaining of funds, a wrongful withholding, and an intent to deprive permanently the Government of its money, yet we hold the conviction must be reversed because the law officer did not partition a single crime into three separate offenses by isolating the manner in which the property was obtained and the precise time when the intent to deprive was formed. If that burden must be assumed by him, then refined specificity in instructions and proof is still required and we did not

414

mean what we said in United States v Aldridge, supra. Moreover, confusion will spring up in many cases because the element of intent is generally not susceptible of direct proof and the precise time it is formed is most difficult to establish. A striking analogy can be found in desertion with intent to remain away permanently. It is just as logical to require the Government to pinpoint the time that the intent to remain away permanently is formed as it is to require the prosecution to select the day the intent to deprive an owner of his property is conceived.

Second, the majority opinion seems to me to be inconsistent within itself. It first holds that the members of the court-martial may have acquitted the accused under the first two charges as a gesture of leniency rather than because of any lack of conviction as to the accused's guilt. Then the opinion goes on to hold that we are compelled to assume that possession was obtained rightfully to determine the theory on which the case was tried. I am not willing to join in that doctrine as we are now dealing with a single conviction. The only assumption we are required to make from this record is that the court-martial found all of the elements of larceny present, and for some reason unknown to us, refused to find the accused guilty of making and presenting a false claim.

In Dunn v United States, 284 US 390, 52 S Ct 189, 190, 76 L ed 356 (1932), the defendant was charged with maintaining a common nuisance and with the unlawful possession and unlawful sale of intoxicating liquor. He was convicted on the first charge of the indictment and acquitted of the two other offenses. The evidence was to the effect that two prohibition agents, in a party of four persons, entered defendant's poolroom and purchased six drinks of whiskey and beer. The sole base for the nuisance conviction was the keeping or sale of the intoxicants and yet the verdict would indicate the jury found neither sale nor possession. The defendant, relying on inconsistent findings, asserted that the conviction could not stand, but in answer to that contention the Supreme Court held:

"Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. Latham v The Queen, 5 Best & Smith, 635, 642, 643; Selvester v United States, 170 US 262, 18 S Ct 580, 42 L ed 1029. If separate indictments had been presented against the defendant for possession and for maintenance of a nuisance, and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as res judicata of the other."

Unless we are to reject that concept, I find no reason for us to be concerned about the findings of not guilty in this instance. And why concern ourselves with making the assumption that the court-martial found the accused obtained the money rightfully? If it wanted to return only one finding on a single transaction or if leniency was the motivating reason, are we compelled to substitute a finding of no unlawful acquisition of property? By what principle of logic do my associates convert their assertion that they cannot ascertain the reason for the findings of not guilty to a presumption that the accused obtained possession of the money rightfully? Had the larceny specification been tried alone, subsequent to a finding of not guilty of the other two offenses, I wonder if the same mental process would have been required. Certainly, if I were to indulge in presumptions in this case, I would presume that the court-martial found present all the elements necessary to sustain the findings of guilt. It may be that I fail to grasp the nice distinctions made in the Court's opinion, but if so, I suspect that the law officer who is assigned to retry this case will encounter the same difficulty. I know of no reason to believe that there will be any substantial difference in the testimony on a rehearing, and I am at a loss to understand how he can tailor his instructions to meet the theories announced in the majority opinion. One question will perhaps illuminate his difficulties. Are the findings on the first two specifications res judicata and must he assume the accused obtained the money right-

fully? If so, we might save the Government time and expense by dismissing this action, as further prosecution will be futile.

Third, I contend that an obtaining of money by false representations is conclusively established by the facts of this case, notwithstanding the defense of mistake of law. It may be conceded that if in a hypothetical case an accused honestly was mistaken about the regulation, he might not have formed the specific intent to defraud the Government, but here his belief that he was entitled to receive payment in advance for his wife's travel had nothing to do with the obtaining of the money. As the majority opinion states, § 7003-2 of the Joint Travel Regulations provides that the allowance payable for a dependent's travel is to be paid after the travel has been completed. While the opinion seeks to strengthen accused's position by suggesting that sometimes payments are made in advance, the intended support can be cast aside as trivial, for the reason that travel funds are paid in advance only upon retirement or separation of personnel from the service and advance payments for dependents' travel are expressly prohibited. However, I need not labor the point that if the accused had shown future travel of his wife as the basis for the claim set forth in his voucher and then obtained the money, his ignorance or mistake might have been a good defense. What my associates overlook is that his asserted misunderstanding as to the law did not bring about the advance payment in this case. He stated he believed he was entitled to a present payment for future travel but his voucher did not set out a prospective trip across the continent. Instead, he falsely asserted a past fact, to wit, that his wife had completed the journey. That he would not have received the money in this case had he not on February 2, 1952, represented that his wife had left Petersburg, New York, on September 23, 1951, and arrived in San Diego, California, on October 17, 1951, or on other dates prior to the submission of the claim, is certain. His statement was no more nor less than a false representation made some four months

**416**

after the transportation was assertedly completed, and he admitted on the witness stand that he knowingly made it without an honest belief in its truth. His counsel willingly conceded such to be the case, for in his closing argument he stated his understanding of the testimony in the following language:

". . . under Article 132 there is another offense, about which you have heard nothing today, and I will go so far as to say it is this offense which the accused has committed. If he were on trial for it I would have to say that he committed it under a mistake of the procedure because he took this pay clerk's, this disbursing lad's statement that 'don't argue about those dates, sign it.' The offense is making or using a false writing or other paper in connection with claims. That's this right on the button. He signed his name to a certification that travel had been performed on dates, which in fact, were not so. There had been no travel in those dates. He knew it. He was home with his wife on that commencement date. That is a mistake in statement. That's a false statement, and had he been tried for that, charged with that, he'd have been pleaded guilty, because you can't get away from it, he signed that."

Aside from the judicial admission by the accused and the concession by his counsel, there can be no question but that under the rule set forth in the Manual for Courts-Martial, supra, the Government's case shows a false pretense.

Paragraph 200a(5) reads in part:

". . . The pretense must be in fact false when made and when the property is obtained, and it must be knowingly false in the sense that it is made without an honest belief in its truth. A false pretense is a false representation of past or existing fact."

Having obtained the money by knowingly making a false pretense, it follows that the accused illegally and wrongfully gained possession of the money. The Manual also covers that subject. At page 358 it reads:

". . . As a general rule, a taking or withholding of property from the possession of another is wrongful if done without the consent of the other, and an obtaining of property from the possession of another is wrongful if the obtaining is by false pretense."

It necessarily follows that no matter in which light I view this record, there simply is no causal connection between accused's claimed mistake of law and his obtaining possession of the money. If I were to assume the law to be as accused asserts he believed it to be, the result would be the same. His alleged honest belief that he might rightfully obtain money under one combination of circumstances is no justification for a holding that his intentional fabrication of an alliance of other facts is a possible means of obtaining money rightfully.

If it be accepted that the accused obtained the money wrongfully, then the only other element of the offense which I need to discuss is the intent to deprive the Government permanently of its property. In the Court's opinion that issue is broken into two parts. The first is whether the facts and circumstances of this case permit a finding by the court-martial that the accused had the requisite intent to sustain a finding of larceny. The second is whether the Government must fix with certainty the time when the intent was formed. There can be no question about the proof of, and instructions on, the presence of the criminal intent. Under accused's own theory he intended to deprive the Government permanently of the money. His story was inconsistent with any other intent as he claimed the funds as his own to use as he saw fit. To escape from that dilemma, my associates say that the findings are vulnerable because the court-martial was permitted to speculate as to whether the intent was formed at the time of the original taking or thereafter. Apparently they arrive at that conclusion because the court-martial was permitted to arrive at a finding on either of two theories, or a combination of both, namely, that the accused obtained the property wrongfully with the concurring intent to deprive permanently, or

he obtained the property rightfully and thereafter wrongfully withheld it with the essential criminal intent. I find no valid reason to strike down that method of arriving at a finding. A single offense need not be dissected into its various methods of commission by either instruction or proof and the Government is not required to limit its theory to any particular means. Neither must it select, at its peril, the precise time the criminal intent is formed. Certainly this record is sufficiently specific in both regards to sustain the conviction, and I have no reason to set this case apart from the ordinary larceny offense. Merely because one court member posed a question does not require us to depart from well-recognized principles of military law. I cannot, of course, determine the reasoning used by the court members in arriving at their findings, but I do know that they found the offense to have been committed on or about February 2, 1954, and that was the day the accused obtained the money. Without resorting to speculation or conjecture, I find nothing in the record to impeach that finding. Admitting inconsistency in the three findings as previously mentioned, that is not fatal to the one involving larceny because we have three alleged crimes arising out of substantially one transaction. The court-martial could have returned a finding of guilty on all three, and there would have been present the necessary instructional framework and sufficient evidence to support all findings. The court-martial did not do so, but the accused is in no position to complain because an adverse verdict was not returned on all specifications. Dunn v United States, supra. If we are to give more than lip service to the rule of that case, it must be concluded that this conviction for larceny need not be overturned because all members did not agree as to the day or the hour when the criminal intent was formulated. The matter of moment was not the time when the intent was formed, but whether it was conceived while the accused was in wrongful possession of the property. On that element there was the required meeting of minds.

**417**

An interesting development in this case is the fact that the law officer originally instructed only on the theory that the accused intended to steal at the time he received the money. The instructional error discussed in Part VI of the majority opinion was brought about by a specific request of defense counsel. After the law officer completed his preliminary charge, the instructions were considered during an out-of-court conference. After termination of the conference, the law officer made certain explanatory remarks, and then said:

". . . There has been a request to charge by defense counsel of two additional charges, which I will read to the members of the court.

"The court is advised that a person who takes, obtains, or withholds the property of another, believing honestly and reasonably, although mistakenly, that he has a legal right to acquire or retain the property, is not guilty of an offense in violation of Article 121, which is the offense charged under Charge II and the specification thereunder, the larceny charge."

It was after that requested instruction was given that a member posed his question concerning the date of the formation of the intent to deprive permanently. The law officer answered by instructing further in the words of the Manual set forth in Part II of the majority opinion, and his instruction accurately submitted what I view as a sound theory upon which a conviction could be predicated. If it is not, the doctrine of larceny as announced by the Manual and approved by us in United States v Aldridge, supra, must be disregarded.

I have no disposition to part from my associates on their holding to the effect that an instruction that a mistake of law must be both honest and reasonable is erroneous. We have so held where a mistake of fact was involved, and in many instances a mistake of fact and a mistake of law are so closely interwoven that it becomes difficult to isolate one from the other. However, I call attention to the fact that in this case defense counsel requested the law officer specifically to instruct in the language which is now under attack. It is a bit unusual to permit counsel for an accused to request an instruction in specific language, have the law officer give the instruction as requested, and hold that he thereby committed error. In most instances that would be an invitation to err and defense counsel should not be permitted to raise self-invited error on appeal. My reason for concurring in this instance is that the law officer had previously given an instruction in substantially the same language and the record does not disclose whether it, too, was at the request of defense counsel. If the record were clear as to that point, I would not so much as consider the claimed error. But, in view of the fact that the record is clouded, I am willing to give the accused the benefit of the doubt and find that the law officer misinstructed in the first instance. However, because I have concluded that the accused's asserted mistake of law did not procure the payment of his claim for travel allowances, that he obtained the money involved only because of an admittedly false pretense, and that he necessarily thereafter held the money wrongfully, I would be unable to agree that he was prejudiced by an erroneous instruction on a subject not in issue.