**UNITED STATES**

v.

**Ruben M. CASTILLO, 461 98 0015, Fireman (E–3), U.S. Navy.**

**NMCM 84 0486.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 4 Aug. 1983.

Decided 17 May 1984.

LCDR Jeanne Carroll, JAGC, USN, Appellate Defense Counsel.

LT J. Cunyon Gordon, JAGC, USN, Appellate Defense Counsel.

LT Ronald S. Wasilenko, JAGC, USNR, Appellate Government Counsel.

Before GREGORY, Senior Judge, and MITCHELL and BARR, JJ.

BARR, Judge:

█ Appellant was tried by special court-martial, sitting as military judge alone, of one specification of larceny, in violation of Article 121, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 921. The specific nature of the offense alleged is the theft of dependent basic allowance for quarters/variable housing allowance (BAQ/VHA) monies during the period 13 March 1981 through 30 April 1982, totalling $4369.24.[1] Upon conviction, pursuant to a plea of guilty, appellant was sentenced to a bad conduct discharge, confinement at hard labor for 60 days, reduction to pay grade E-1, and a fine of $2000.00. The findings and sentence as they reach us remain unchanged, except that the convening authority, in accordance with the terms of a pretrial agreement, suspended the bad conduct discharge for a period of one year from the initial date of trial.

Appellant has assigned two errors for our consideration.

I

## TRIAL JUDGE ERRED BY FAILING TO DISCLOSE GROUNDS FOR CHALLENGE OF HIMSELF IN A TRIAL BY MILITARY JUDGE ALONE.

█ The mere fact that the military judge tried, or presided over the court which tried, appellant's alleged co-actor is not a ground which *per se* required the judge to recuse himself. Furthermore, the record of trial fails to disclose any facts which would support, at this level of review, any finding that a challenge for cause against the military judge would, or even should, have been granted. Sufficient facts of his participation in the trial of the co-actor were revealed by the military judge such that, to adopt the position proffered by the Government, "trial defense counsel had a duty to speak out at trial if he suspected a ground for challenge existed as to the military judge. His failure to do so constituted waiver." The assignment of error is rejected.

II

## INSUFFICIENT FACTUAL BASIS WAS SHOWN IN SUPPORT OF TRIAL COURT'S ACCEPTANCE OF APPELLANT'S PLEAS OF GUILTY TO LARCENY.

Disposition of this issue necessitates a recitation of the facts developed during the two providence inquiries conducted into the offense. At the initial session of court held on 29 July 1983, appellant attempted to plead guilty on the theory of a wrongful obtaining-type larceny. The facts elicited showed that a Personnelman Seaman (PNSN) "C" approached appellant and suggested a scheme to falsely fill out a page 2 service record entry to entitle appellant to dependent BAQ. Appellant was single at the time and refused to join in the fraudulent venture. Subsequently, on 13 March 1981, appellant noticed that approximately

---

1. The specification in question did not allege the identity of the owner of the funds stolen. Applying the standard enunciated in *United States* v. *Sell*, 3 U.S.C.M.A. 202, 11 C.M.R. 202 (1953), we find the statement of the specification sufficient as a matter of law.

$300 had been placed in his credit union account by allotment. At the 29 July session of the trial, appellant revealed his belief that his name had been forged by "C" to the page 2 and that probably a Disbursing Clerk Second Class (DK2) "P" forged appellant's name to an allotment form. We assume that appellant's "entitlement" to VHA became automatic upon the "authorization" of dependent BAQ. Appellant claimed neither knowledge of, nor participation in, the frauds perpetrated by "C" and "P." While he did admit that he knew he was receiving money to which he was not entitled, he steadfastly maintained that he neither knew, nor suspected, the source of this "windfall" or the identity of the true owner. Notwithstanding his belief that his entitlement to the monies deposited in his credit union account was highly questionable, appellant spent the funds without either concern for the legitimacy of his claim to them or the making of any inquiry to ascertain their source. The deposits continued to be made to appellant's account, twice a month, through January 1982, without appellant suspecting the source to be Government funds in the form of dependent BAQ/VHA monies wrongfully obtained. Appellant was married on 3 February 1982. When he went to the personnel office to now legally claim his entitlement to dependent BAQ/VHA, he was advised that he had been receiving such monies since March 1981. The record is void of any inquiry into what actions, if any, the Government or appellant took between February and the end of April 1982 to stop the aforementioned allotment. We may infer that no actions were taken, for the fraudulent scheme which had its genesis in March 1981 continued unabated and uncorrected through 30 April 1982—notwithstanding the fact that the receipt of such monies was now known by both appellant and the Government to have been illegal.

Under these developed facts, the military judge, quite properly, rejected appellant's guilty plea to a wrongful obtaining of the monies. The unequivocal admissions of appellant established that no false representation was ever directly made by appellant to anyone in order to obtain the money and that he was, at no time, a party to any fraudulent representations that may have been made by "C" and "P" in the course of completing the documents which purported to evidence appellant's rightful claim to dependent BAQ/VHA. Thus, the law of principals, as set forth in Article 77, UCMJ, 10 U.S.C. § 877, was not available to define, within the scope of a false pretenses-type larceny, appellant's actions during the periods alleged in the charge. Faced with this impasse in the providence phase of trial, the case was continued by the military judge.

When the court reconvened on 4 August 1983, a new theory of appellant's criminal culpability was advanced—wrongful withholding. In support of this theory, trial counsel suggested that Article 1137, U.S. Navy Regulations, 1973 (U.S. Navy Regs.), established the duty of appellant to account for the monies received. As the regulation fell within the category of a general regulation or order, punishable under Article 92, UCMJ, 10 U.S.C. § 892, knowledge of its substance, and thus the duty to account supposedly contained therein, could be presumed. The military judge thereafter conducted the providence inquiry along the theory of wrongful withholding predicated on the "presumed" duty. The very leading questions of the inquiry, to which appellant did no more than respond "yes" in answer, resulted in what can be read as a virtual repudiation, without explanation, of the facts relating to his knowledge of the source of the monies as elicited during the first session of trial. Appellant now admitted his knowledge, as of March 1981, that the monies deposited within his credit union account were overpayments from the Government—yet no inquiry was conducted to establish from what facts this knowledge emanated. Appellant further admitted his duty to inform the Government about the overpayments when they were received and that his failure to do so constituted a wrongful withholding from the Government. In the absence of adequate development of this factor during the provi-

dence inquiry, we can only infer that appellant's recognition of this duty was the product of being acquainted with the substance of Article 1137, U.S. Navy Regs.—and was born contemporaneous with rejection of his initial plea of guilty and the "discovery" of the existence of Article 1137.

We do not hesitate to disclose our dissatisfaction with the patent inadequacy of the supposed "factual" inquiry conducted on 4 August 1983. Without amplification upon the underlying facts which would serve to explain away the gross inconsistencies between the admissions elicited during the two sessions of trial, we naturally ponder whether appellant's recantation is the product of repentance for having initially misled the court concerning the degree of his culpability or a desire to retain, at any cost, the benefits of his pretrial ·agreement. More is required of a providence inquiry than is evidenced in this case.

■ We also express grave doubts about the propriety—let alone the legality—of "bootstrapping," in a larceny charge, not only the requirement of the duty to account contained within the concept of a wrongful withholding, but also the knowledge of that duty, from a general regulation which is not pleaded, either expressly or by clear implication, in the statement of the charge and the knowledge of which is presumed as a matter of law. Proceeding under this general regulation theory upon which the plea was found provident, the element of knowledge must pervade in any inquiry into criminal culpability. First, there is the knowledge of the existence of the regulation, which is, supposedly, presumed. Second, there is the knowledge that there exists not only a deficit or excess, but that it be of public money or property. Finally, there is the knowledge that a duty exists to report said deficit or excess. When viewed in this light, it is altogether clear why appellant's admissions on 4 August, which contradicted his prior disavowals of knowledge of the source of the funds deposited in his account, were essential. However, assuming for the moment that appellant's criminal liability can be predicated on the

"bootstrap" approach, we find no clear acknowledgement by appellant that he possessed, *at the time he initially received the monies in question*, the knowledge of his supposed duty to account which, under the theory of providence advanced, arguably became an "adopted" element of the charged offense. Perhaps this knowledge is subsumed within the presumption which attends a general regulation. If this be so, permitting knowledge of a general regulation which imposes an affirmative duty, and which is ancillary to the charged offense, to be presumed not only relieves the Government of proving extant knowledge of the duty to account incident to a wrongful withholding larceny but, under certain circumstances, could have the effect of depriving an accused of the right to raise ignorance of the law or regulation as a matter in defense. *See, generally, United States v. Sicley,* 6 U.S.C.M.A. 402, 20 C.M.R. 118 (1955); Paragraph 216*j, Manual for Courts-Martial, 1969 (Rev.)* (MCM).

We address two additional concerns with the methodology utilized in this case to "find" the requisite "duty to account" from some source apart from the traditional concept of a fiduciary relationship, which is at the core of a wrongful withholding offense. First, under the Government's theory of the case pressed before this Court, appellant, at the time he received the first "deposit" to his credit union account, both knew that the monies involved had been stolen from the Government and had the duty to report this "deficit" or "excess" to his superior. Not being a party to the initial theft perpetrated by "C" and "P," and having already received property then knowing it to be stolen, compliance with Article 1137, U.S. Navy Regs., would have arguably required appellant to incriminate himself concerning a charge of receiving stolen property. The problems which can surface in such a scenario are described in *United States v. Tyson,* 2 M.J. 583 (N.C.M. R.1976).

Secondly, we pose the question as to exactly what, if any, criminal culpability is reached by Article 1137, U.S. Navy Regs.

On its face, it appears similar to the requirements of Articles 1139 and 1140, U.S. Navy Regs., which have for their stated purpose the *reporting* of crimes, or potential crimes. Clearly, Article 1137 discloses a reporting requirement, for which failure to comply might be reached by criminal process. Whether it, in addition, establishes an independent duty to account, which translates, when there is a failure to do so, into an essential requirement for finding a withholding-type larceny is debatable. No cases have come to our attention which interpret Article 1137. As its interpretative reach is not necessary to a resolution of this case, we do no more than rhetorically suggest caution in its use for such purposes.

Notwithstanding the reservations expressed above concerning the factual contradictions between the two providence inquiries and the legal application and implications of applying Article 1137 to prove up an element of an offense other than an orders violation, we shall proceed by accepting as facts those assertions of appellant which the Government contends establish a provident plea to a wrongful withholding. Summarized, those admitted facts are: (1) that "C" and "P," without the collusion or knowledge of appellant, falsified service record entries affecting appellant's entitlement to the allowances of dependent BAQ/VHA; (2) that the conduct of "C" and "P" was larcenous; (3) that the monies so obtained by "C" and "P" were diverted, by allotment, to appellant's credit union account for the benefit of, but without the complicity of, appellant; (4) that, contemporaneous with appellant's awareness that these funds were being deposited in his account, appellant knew that the true owner of said funds was the U.S. Government and that his military pay record was the channel through which the funds found their way by allotment into the credit union account; (5) that appellant knew he was not entitled to the funds deposited; (6) that appellant concluded that he had a duty to account for these funds to the U.S. Government; and, (7) that appellant failed to account for the funds and, by spending the deposited monies, intended to permanently appropriate the funds to his own use.

Article 121, UCMJ, when drafted, was "intended to combine the offenses of larceny by asportation, larceny by trick and device, obtaining property by false pretenses, and embezzlement." INDEX AND LEGISLATIVE HISTORY: UNIFORM CODE OF MILITARY JUSTICE, at 1232. It "created no offense not theretofore known to military law." *Sicley, supra,* at 126, fn. 1. We must therefore determine whether the facts adopted above prove the traditional embezzlement-type larceny, for it is clear that, as to appellant's culpability, no other form of larceny is legally applicable.

In *United States v. Aldridge,* 2 U.S.C.M.A. 330, 8 C.M.R. 130 (1953), the Court of Military Appeals, in discussing the legislative history of Article 121, UCMJ, stated that "the particular means of acquisition of the property became relatively unimportant, and the critical question in each case now is the intent with which the property in question is held by the accused." *Aldridge, supra* at 131–132. By this statement the Court merely asserted that a pleading alleging that an accused "did steal" was sufficient to state an offense regardless of what type of larceny was at issue. It certainly did not intend to conclude that the manner in which an accused came into possession of the stolen property was of no consequence. A wrongful taking still required a trespass, a wrongful obtaining required a false pretense, and a wrongful withholding required a wrongful conversion of lawfully obtained property, whether possessed or held as custodian.

When testing whether an offense of wrongful withholding has been proved, or providently pleaded to, we search for two factors which give definition to the term "withholding": (1) a fiduciary relationship; and, (2) an initial lawful possession. *See, United States v. McFarland,* 8 U.S.C.M.A. 42, 23 C.M.R. 266 (1957). Though the language in *Sicley* might convey the impression that a fiduciary relationship is not

essential to the military statute on embezzlement, any contention in that regard was laid to rest in *McFarland,* where, after quoting from Paragraph 200*a, Manual for Courts-Martial, United States, 1951,* which provided a substantive discussion of larceny, the Court stated:

> In this last-quoted passage 'failure to account for property belonging to another where an accounting is due' applies to the offense of embezzlement where the existence of a fiduciary relationship is essential to conviction. The second subdivision, namely the application of 'property to a use not authorized by its owner' is specifically designed to cover those situations dealing with conversion by a person having lawful possession.

*McFarland,* at 270.

It has been said that in a statute providing for embezzlement "or" fraudulent conversion, "the 'or' clause is to be understood as explanatory rather than additional, because the word 'embezzle' means to convert fraudulently to one's own use." R. PERKINS, PERKINS ON CRIMINAL LAW, at 294 (2d Ed., 1969). If this be so, the syllogistic conclusion, when read in connection with the above quoted language from McFarland, is that a fiduciary relationship is also essential to the "second subdivision" of the referenced Manual provision, that is, to a fraudulent conversion by a person having lawful possession. When dealing with larcenous-type offenses, distinction has also been drawn between one in lawful possession and one in lawful custody. *See,* PERKINS, *Id.,* at 240. Considered in this light, the following permutations from the definitions and distinctions arise, any one of which, if factually or legally existing, would appear sufficient to sustain a finding that appellant's plea was provident; (1) a fiduciary relationship coupled with lawful possession; (2) a fiduciary relationship coupled with lawful custody; (3) no fiduciary relationship, but lawful custody; or, (4) no fiduciary relationship, but lawful possession.

■■ At the core of a fiduciary relationship is the element of a *mutual exchange* of trust for good faith, that is, the reposition of trust and confidence between agreeing parties who act in good faith in their dealings with one another. One must hold the *res* which is the alleged subject of a charged embezzlement for the benefit of the other. We search in vain to find any fiduciary relationship between appellant and the Government. Appellant became a holder of the monies quite contrary to the intentions of the Government and certainly without its consent. Regardless of whether he held the money lawfully or unlawfully, it was not for the benefit of the Government based on a mutual understanding of trust. Appellant was never a direct party to any agreement with the Government, whether express or implied. Appellant stood in no relation with the Government that would traditionally call for the exercise of the duties of a fiduciary. Moreover, we are unwilling to read Article 1137, U.S. Navy Regs., to create an "artificial" fiduciary relationship to arise out of the supposed duty to account which the Government suggests is textually contained within that regulation.

We need not, however, resolve the issue under inquiry under the basis of the existence or lack thereof of a fiduciary relationship between appellant and the Government. Assuming, arguendo, that such a relationship is conclusively established by the application of Article 1137, we find that appellant's holding of the monies, be it denominated as custodial or possessory, was unlawful *ab initio.* All funds deposited in his account between March 1981 and April 1982 were stolen from the Government by "C" and "P," appellant's benefactors. In the absence of bona fides in the transfer of title to property, the grantee of property obtains no greater title or right than that possessed by his grantor. As the funds were obtained unlawfully by "C" and "P," appellant's possession or custody was also unlawful. The Government, from the first moment of diversion of the monies by "C" and "P," had a legitimate cause of action against appellant for the monies deposited in his account. Thus, even if appel-

lant's conduct were completely innocent and without criminal intent, his holding of, and right to, the monies was unlawful. Appellant, therefore, cannot be guilty of a withholding-type larceny, for he did not lawfully come into possession or custody.

Our conclusions regarding the necessity of finding a fiduciary relationship and a lawful holding has historical support in the legislative hearings leading to the adoption of Article 121, UCMJ. We quote the pertinent portion of that hearing:

> Mr. Elston. Well, of course, in order to convict of embezzlement there has to be not only agency but the property must have come in to his possession by virtue of his agency.
>
> The mere fact that he is employed by the Government or the fact that some property came into his possession would not make him guilty of embezzlement unless it came into his possession by virtue of his agency.
>
> To illustrate what I mean: Say a man is a cashier. If property came into his possession as cashier and he appropriated to his own use he would be guilty of embezzlement.
>
> But if he went across the aisle and appropriated money from some other cashier's cage he would not be guilty of embezzlement but of larceny.
>
> Mr. Larkin: That is right. But the question of agency hinges on the fact, does it not, that the custody he has over it is a lawful one. Whether it is a full-blown agent or whether it is an agent for purposes of custody is immaterial. It is the lawful custody.

INDEX AND LEGISLATIVE HISTORY: UCMJ, at 1245.

This interpretation was followed by the Court of Military Appeals in *McFarland* where the following proposition was stated:

> Generally in embezzlement, the property comes lawfully into the accused's possession by virtue of the existence of a fiduciary relationship with the owner.

*McFarland,* at 270.

In the absence of a fiduciary relationship existing between appellant and the Government, which, as we have indicated, we find lacking, the facts admitted by appellant during the second session of trial appear to fit within the elements necessary to make out the offense of receiving stolen property, then knowing the same to be stolen, a violation of Article 134, UCMJ. The monies were stolen by "C" and "P," and appellant, at the time he received them, knew that they were stolen from the Government. This knowledge of the source of the funds and the manner of their obtainment does not, however, translate into a wrongful withholding. Paragraph 200a (2), MCM, is dispositive on this point:

> (A)cts which constitute the offense of unlawfully receiving, buying, or concealing stolen property ... or of being an accessory after the fact ... are not included within the meaning of the word "withholds." Therefore, neither a receiver of stolen property nor an accessory after the fact can be convicted of larceny on the theory that with knowledge of the identity of the owner he withheld the stolen property from the possession of the owner.

This Manual provision not only removes appellant's conduct from the definition of a wrongful withholding-type larceny, but also states what has been traditionally viewed as the inconsistency existing between the acts of larceny and receiving stolen property. This incompatibility of elements between these offenses means that we cannot approve a conviction of unlawfully receiving stolen property as a lesser included offense of larceny. *McFarland, supra.*

The finding of guilty to the Charge is set aside and the same ordered dismissed. In doing so, we render no opinion concerning the legality or propriety of referring a charge of unlawfully receiving stolen property to a court-martial or the sufficiency of the evidence now before us to sustain such a charge.

Senior Judge GREGORY and Judge MITCHELL concur.