UNITED STATES

v.

**Larry A. GREEN, Machinery Technician Third Class, U.S. Coast Guard.**

**Docket No. 824.**

U. S. Coast Guard Court of Military Review.

5 May 1980.

Trial Counsel: LCDR Larry S. Craig, USCG.

Defense Counsel: CAPT Michelle G. Murdoch, USA.

Appellate Defense Counsel: LT Robert R. Meeks, USCGR.

Appellate Government Counsel: LCDR Robert W. Ferguson, USCG.

## OPINION

MORGAN, Chief Judge:

Machinery Technician Third Class Larry A. GREEN, U. S. Coast Guard was tried by special court-martial convened by Commander, Thirteenth Coast Guard District on 1 August 1979. The accused pleaded guilty to and was convicted of conspiracy to commit larceny in violation of Article 81, Uniform Code of Military Justice, 10 U.S.C. § 881, one offense of wrongful appropriation of a truck and two offenses of larceny in violation of Article 121, UCMJ, 10 U.S.C. § 921 and of unlawfully entering a government tool storage room in violation of Article 130, UCMJ, 10 U.S.C. § 930. The members sentenced the accused to be confined at hard labor for one month, to forfeit $50.00 per month for six months, to be reduced to pay grade E–3 and to be discharged from the service with a bad conduct discharge. The sentence was approved by the convening authority.

Appellate defense counsel points out that there is no indication in the record that the accused has been provided a copy of the record as required by Article 54(c), UCMJ, 10 U.S.C. § 854(c); the staff legal officer's

review shows only "copy to" defense counsel rather than service of the review on defense counsel as required by *U. S. v. Goode*, 1 M.J. 3 (C.M.A.1975); and, there is no indication that the accused was advised of his appellate rights as required by paragraph 48k(3), Manual for Courts-Martial, 1969 (Rev.) and Section 512–1(a) of the Coast Guard Military Justice Manual, CG–488.

In reply the government has filed affidavits executed by trial counsel and defense counsel together with Receipts for Certified Mail. These show variously that defense counsel advised the accused of his appellate rights in accordance with paragraph 48k, MCM, 1969 (Rev.); that defense counsel received and reviewed the record of trial on 17 September 1979; that the accused receipted for a copy of the record of trial on 26 December 1979; and, that defense counsel receipted for a copy of the legal officer's review and a copy of a proposed convening authority action on 26 November 1979. The affidavit of defense counsel also states that she consciously chose not to comment on the legal officer's review or to submit a brief pursuant to Article 38(c), UCMJ, 10 U.S.C. § 838(c). The convening authority took action 5 December 1979.

Article 54(c), UCMJ, requires that "a copy of the record of the proceedings of each general and special court-martial shall be given to the accused as soon as it is authenticated." This provision of the Code clearly contemplates that a copy of the transcript will be served on the accused well before action is taken by the convening authority since such action may not precede authentication. In *U. S. v. Cruz-Rijos*, 1 M.J. 429 (C.M.A.1976) the Court of Military Appeals said that the government had erred in failing to provide the accused a copy of the record of his trial as soon as it was authenticated. The Court added, however, that in cases in which an accused has been transferred or confined at a location different from that where his trial defense counsel is located, the government may satisfy the spirit of Article 54(c) by serving the transcript on his counsel together with a

copy of the staff judge advocate's review in accordance with the guidelines set forth in *U. S. v. Goode, supra.*

■ The record before us does not reveal the whereabouts of the accused prior to the convening authority's action. However, the record does reveal that his defense counsel was an Army Judge Advocate stationed at Fort Lewis, Washington and the accused receipted for his copy of the record at Snoqualmie, Washington on 26 December 1979, some three weeks after the convening authority's action. With this information we believe that we may, without further inquiry, assume that the accused and defense counsel were at different locations so that delivery of the record of trial to defense counsel for examination prior to the convening authority's action satisfied the spirit of Article 54(c). We accept the affidavits of trial counsel and defense counsel as showing also that defense counsel was served with a copy of the legal officer's review and a copy of the proposed convening authority action more than five days before the convening authority acted on the record so as to fulfill the requirements of *U. S. v. Goode, supra.* See *U. S. v. Marcoux,* 8 M.J. 155 (C.M.A.1980); *U. S. v. Zimmel,* 7 M.J. 711 (A.F.C.M.R.1979) petition for review by USCMA denied 7 M.J. 331.

Appellate defense counsel also challenges the adequacy of the legal officer's review pointing out various inconsistent or misleading statements, e. g. a statement one place that the accused was tried 2 August 1979 while at another place it is asserted that he was tried 1 August 1979; a statement one place that the accused pleaded guilty to all charges and specifications while on another occasion it is stated that the military judge dismissed charge III and the specification thereunder on motion of the defense counsel before pleas were entered. Other discrepancies of equal import are also enumerated.

■ Accuracy in a legal officer's review is imperative since errors which present a fair risk of misleading the convening authority in his review of the case may require a new advice. *U. S. v. Fields,*

9 U.S.C.M.A. 70, 25 C.M.R. 332 (1958); *U. S. v. Cruse,* 21 U.S.C.M.A. 286, 45 C.M.R. 60 (1972). Inaccuracies or misstatements which become minor when viewed in the context of the entire record will not justify setting aside an otherwise valid advice. *U. S. v. Morris,* 8 U.S.C.M.A. 755, 25 C.M.R. 259 (1958); *U. S. v. Sulewski,* 9 U.S.C.M.A. 490, 26 C.M.R. 270 (1958); *U. S. v. Russell,* 2 M.J. 94 (C.M.A.1977). Tested by these standards we believe that the statements in the legal officer's review in this case which are found by appellate defense counsel to be inaccurate or misleading are inconsequential when the review is considered as a whole so as to present no fair risk that the convening authority may have been misled. *U. S. v. Morris* and *U. S. v. Sulewski,* both *supra.* Trial defense counsel evidently also viewed the challenged statements as mere minor inaccuracies since she chose not to challenge the adequacy of the review. See *U. S. v. Goode, supra; U. S. v. Watkins,* 2 M.J. 1276 (C.G.C.M.R.1976); *U. S. v. Barnes,* 3 M.J. 406 (C.M.A.1977).

The principal issue advanced by appellate defense counsel is that statements made by the accused during inquiry into the providence of his guilty pleas pursuant to *U. S. v. Care,* 18 U.S.C.M.A. 535, 40 C.M.R. 247 (1969) and testimony he gave during sentencing proceedings raised the defense of mistake of fact. These statements relate to the charge alleging conspiracy to steal a ship's propeller, to a specification alleging larceny of the ship's propeller and to a specification alleging wrongful appropriation of a government truck used to haul the propeller to the salvage company where it was sold. Appellate defense counsel interprets some of the statements as demonstrating the accused's belief that the ship's propeller had been abandoned by the government and that he was authorized to use the government truck to haul the propeller away for scrap. Those statements it is argued reveal an honest mistake of fact on the part of the accused so as to negate any criminal intent thereby rendering the pleas of guilty improvident.

The pertinent statements and testimony of the accused bearing on the providence of his guilty pleas are as follows:

"ACCUSED: * * * [We] were working on the clean-up detail. We had a fork truck down there for moving timbers and stuff. We were working down there and I myself needed some money and I knew CHANCELLOR did and I just kind of brought up the suggestion asking him if he wanted to help me get one of those, or get one and I can't remember if he said 'Yes' or 'No'. He probably shrugged his shoulders and we ended up using the fork trucks setting one of the propellers in the back of the truck which I had been told about a year before that none of them belonged to anything. They were just scrap. They were just sitting there because there was nothing to do with them. We got the one in the pickup. I drove the pickup out of the warehouse and CHANCELLOR took the fork truck back down to the supply area where it was kept and then we went on out down to the company where we sold it at."

\* \* \* \* \* \*

"MJ: What were the propellers? Could you describe them a little more?
ACCUSED: They were, at the time I didn't know that they fit anything. They were about 6 to 7 foot across from blade tip to blade tip. From what I had been told by people around who seemed to know that they didn't fit anything and all the ships were gone and all the ships that they fitted had been decommissioned. After we got it, about 2 or 3 days later we heard that it was actually one to fit the Cutter FIR and they were going to be needing it for their yrad availability.
MJ: About what time of day did this take place?
ACCUSED: Somewhere after 2 o'clock in the afternoon. Between 2 and 4 I would imagine, sir. * * * "
"MJ: You described a truck and a fork lift. Were these Government vehicles?
ACCUSED: Yes, sir, they were."

\* \* \* \* \* \*

"MJ: Were you normally authorized to use those vehicles?
ACCUSED: Yes, sir.
MJ: So, when you went down there and performed your duties you had authority to use the vehicles?
ACCUSED: Yes, sir, we did.
MJ: What was your impression about who owned the propeller?
ACCUSED: I knew the Government owned it, sir, but from what I had been told it didn't belong to anything and that they had been trying to get rid of them and couldn't because there was something in paperwork or something like that.
MJ: Why were you interested in taking one? Did you know you could sell them?
ACCUSED: Yes, sir. We have in the past been allowed to take scrap metal from the pier from the base, Support Center North and sell it and I have hauled out some junk cars before and I knew that the brass was worth more than steel was.
MJ: What sort of things had you been permitted to take from the base and sell in the past?
ACCUSED: From the base there was old anchor chain, scrap metal laying around from when the base was cleaned up and stuff.
MJ: And who said you could take it and sell it?
ACCUSED: Nobody really said we could take it and sell it. The first load we got I intended to build a fence with it and once we got it I found out exactly how big it was, there was no way that I had to be able to build a fence out of it and NAGLE came up with the idea to sell the stuff. We figured since it had been given to us, they didn't really care. The next day we were down at the pier and we ran into Mr. McENTEE and he said to us that if we wanted anymore we could have it for the taking because he wanted to the base itself cleaned up.
MJ: Who is Mr. McENTEE?
ACCUSED: Mr. McENTEE is the Warrant Boatswain Mate. He used to be the

XO at the Base. After the command change he was the Maintenance Officer of Support Center North."

\* \* \* \* \* \*

"MJ: About how long before the date of 30 March had these actions occurred?
ACCUSED: Probably 4 or maybe 5 months before, possibly. I'm not sure, sir.
MJ: Did you think on 30 March that the propeller might be in the same category as the scrap metal you picked up?
ACCUSED: More or less, yes, sir. After being told, well, a year before I was in charge of a crew tearing down a building at the pier that was referred to as a morgue, it was a cold storage area. Those things were all setting beside the building and he asked us that when we were ready to drop the building to at least let them know so they could move them because they did not want them damaged because for some reason I'm not sure, but I was talking to some of the people then, I can't remember who it was, and they were talking to us and they did not know why they were worried about them being damaged because they didn't fit anything."
MJ: But you knew that the Government didn't want them damaged?
ACCUSED: Yes, sir.
MJ: So, you knew they didn't want them damaged, you probably realized that they didn't want them sold either?
ACCUSED: Yes, sir, in the long run we did."

\* \* \* \* \* \*

"Q. [By Defense Counsel]. Now, about the propeller, what's the situation on that?
A. [By the accused]. Well we were working down at the end of the warehouse on a work detail cleaning up and we had a pickup and a fork truck and a kind of a spur of the moment thing. 'Hey, you wanna get the screw?' And, we agreed and loaded the thing up and took it off.
Q. Now, what was your impression as to the status of that propeller?

A. From what I was told, approximately 6 to 8 months before, that the screws that are down at the Pier never fit anything. I had no idea that it belonged to the Cutter FIR or that it had any value to any ship that I knew of.
Q. Now, was this just scuttlebutt that you picked up?
A. When we were, there was a building down at the pier called the morgue, it used to be the old cold storage. The screws were all laid beside that and I can't remember who we were talking to one day that were tearing the building down, but we had washed a bunch of peat gravel off the roof and somebody came up and commented on it and Mr. CAMPBELL, the supply officer down there, said that to be careful with washing the rocks on it and then we talked to somebody else and I can't remember who it was and he couldn't understand why he was worrying about the peat gravel going on it because they didn't fit anything.
Q. Have you since then found out that that wasn't the case?
A. Yes. About a week after we got the propeller we found out that it did belong to the Cutter FIR.
Q. Had you known that it belonged to something specific that was actually something that would be used by the Coast Guard would you not have taken it?
A. No, definitely not.
Q. And, was the reason that you took the propeller down to get money to help you out of your financial situation?
A. Yes, it was."

\* \* \* \* \* \*

"Q. Is that the only reason you took the propeller?
A. Yes, it is."

 Article 45, Uniform Code of Military Justice, 10 U.S.C. § 845 provides that if an accused, after a plea of guilty is entered, "sets up matter inconsistent with the plea \* \* \* a plea of not guilty shall be entered in the record, and the court shall proceed as though he had pleaded not

guilty." Where inconsistent matter is set up, the military judge has the duty to inquire into the circumstances and, if the accused persists in his statements, to reject the plea. *U. S. v. Thompson*, 21 U.S.C.M.A. 526, 45 C.M.R. 300 (1972); *U. S. v. Lewis*, 18 U.S.C.M.A. 287, 39 C.M.R. 287 (1969); *U. S. v. Vance*, 17 U.S.C.M.A. 444, 38 C.M.R. 242 (1968). The words of Article 45, UCMJ, manifest a congressional intent that guilt be acknowledged consistently from the plea through the sentence. *U. S. v. Thompson, supra; U. S. v. Woods*, 22 U.S.C.M.A. 137, 46 C.M.R. 137 (1973). Slight inconsistencies not amounting to a negation or disavowal of any of the essential elements of the offense do not require rejection of the plea. *U. S. v. King*, 6 M.J. 927 (A.F.C.M.R.1979) petition for review by USCMA denied 7 M.J. 214.

In this case appellate defense counsel does not assert that the accused's statements negate or disavow any of the essential elements of the offenses. Instead he argues that the accused's statements were such that the military judge should have been alerted to the availability of the defense of mistake of fact.

The Court of Military Appeals has held that where an accused's responses during the providence inquiry suggest a possible defense to an offense to which a plea of guilty has been entered the military judge should explain the elements of the defense and ascertain from the accused whether he desires to avail himself of the potential defense. He must also secure from the accused a factual basis to assure that the defense is not available. Otherwise, he must reject the guilty plea. *U. S. v. Jemmings*, 1 M.J. 414 (C.M.A.1976); *U. S. v. Timmins*, 21 U.S.C.M.A. 475, 45 C.M.R. 249 (1972).

To sustain the defense of mistake of fact in this case the accused's belief that the ship's propeller had been abandoned by the government and his belief that he was authorized to use the government truck to haul the propeller to the salvage company for sale must have been honest. *U. S. v.*

*Rowan*, 4 U.S.C.M.A. 430, 16 C.M.R. 4 (1954); *U. S. v. Sicley*, 6 U.S.C.M.A. 402, 20 C.M.R. 118 (1955); *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). The accused's statements and testimony do not reveal an honest belief either that he was authorized to use the government truck for personal gain or that the ship's propeller had been abandoned by the government.

■ The accused's statement regarding use of the government truck and forklift says no more than that he was authorized to use them in the performance of his duties and gave no hint of any belief that he was entitled to use the truck for his personal benefit. And his statements respecting the ship's propeller make abundantly clear his knowledge that it was government property which the supply officer was endeavoring to protect from damage. Even had the propeller not been serviceable the accused knew that it could not be disposed of "because there was something in paperwork or something like that." Thus, when the accused's statements and testimony are viewed in their entirety they fully support the guilty pleas and do not raise the potential defense of honest mistake of fact so as to require further inquiry by the military judge or rejection of the pleas. *U. S. v. Wright*, 6 U.S.C.M.A. 186, 19 C.M.R. 312 (1955); *U. S. v. Logan*, 22 U.S.C.M.A. 349, 47 C.M.R. 1 (1973); *U. S. v. Hebert*, 1 M.J. 84 (C.M.A.1975).

The findings of guilty and the sentence are affirmed.

Judges HOLLAND and BRIDGMAN, concur.

Judge ALCANTARA did not participate in the decision in this case.