**UNITED STATES, Appellant,**

v.

**Anthony M. ANTONELLI, Senior Airman U.S. Air Force, Appellee.**

No. 66,843.
ACM 28856.

U.S. Court of Military Appeals.

Argued Jan. 9, 1992.

Decided Sept. 14, 1992.

For the Accused: *Major Mary C. Yastishock* (argued); *Colonel Jeffrey R. Owens* and *Major Ronald G. Morgan* (on brief).

For the United States: *Major Jeffrey C. Lindquist* (argued); *Lieutenant Colonel Brenda J. Hollis* (on brief).

*Opinion of the Court*

WISS, Judge:

At his general court-martial, which included enlisted members, Antonelli pleaded not guilty to charges alleging larceny of money from the United States over a peri-

od of time and two instances of signing a false official document with intent to deceive, in violation of Articles 121 and 107, Uniform Code of Military Justice, 10 USC §§ 921 and 907, respectively. Nonetheless, he was convicted as charged and was sentenced to a bad-conduct discharge, confinement for 6 months, reduction to the lowest enlisted grade, and a fine of $10,000. The convening authority approved these results. The Court of Military Review in an unpublished opinion disapproved a portion of the larceny finding but otherwise affirmed the findings. On reassessment of the sentence, that court affirmed the approved sentence except for the fine.

This Court received this case under Article 67(a)(2), UCMJ, 10 USC § 867(a)(2) (1989). Specifically, we are asked:

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED IN *UNITED STATES V. ANTONELLI* BY HOLDING THAT A WRONGFUL WITHHOLDING THEORY OF LARCENY UNDER ARTICLE 121, UCMJ, REQUIRES THE [ACCUSED] TO HAVE ACQUIRED THE FUNDS UNLAWFULLY, AND BY HOLDING THAT THE FACTS OF THE CASE DO NOT ESTABLISH A DUTY TO ACCOUNT ON THE PART OF [THE ACCUSED].

Upon consideration of this question, we conclude that the record must be returned to the Court of Military Review for further consideration.

## I

Most of the relevant facts are set out in the opinion below as follows:

In November 1975, Antonelli was ordered by court decree to pay $125 per month in child support. The payments were to continue until January 1992, when his daughter would reach the age of 18. Since 1975, Antonelli has had no contact with either his ex-wife or daughter. He made no child support payments from 1977 through January 1990.

Antonelli reenlisted on 13 November 1986 for three years. The charges against him relate to misconduct during that term of enlistment. On 4 November 1987 and again on 27 September 1989, Antonelli certified that he was supporting his daughter. Those certifications were false. Based on them, however, he was paid variable housing allowance (VHA) and basic allowance for quarters (BAQ) at the higher "with dependent" rate. He received some $3,600 more than he should have during the charged period.

\* \* \*

The prosecution maintained two theories to support the larceny charge. *For the period 1 December 1986 through 3 November 1987, they argued that the larceny was effected by a wrongful withholding.* For the remainder of the period, 4 November 1987 through 13 September 1989, the larceny was accomplished through a wrongful obtaining by false pretense. The appellant does not dispute the correctness of the conviction as to the latter period, which was proven by the false certification on 4 November 1987.

Unpub. op. at 1-2 (emphasis added).

In holding that the evidence was "insufficient to support" the conviction of larceny for the period of December 1, 1986, through November 3, 1987, "under a wrongful-withholding theory," the Court of Military Review reasoned as follows:

In this case, the government offered no evidence to show that Antonelli unlawfully obtained the funds he received from 1 December 1986 through 3 November 1987. The government also failed to prove that he had any duty to account for the money during that period; keeping pay to which one is not entitled may create a civil liability, but under the circumstances here, a conviction under an Article 121 withholding theory cannot be sustained. *United States v. Ford,* 12 USCMA 3, 30 CMR 3 (1960); *United States v. Watkins,* 32 MJ 527 (ACMR 1990). Unless the government shows that an overpayment was fraudulently induced, an individual who simply fails to inform authorities of an overpayment is

not criminally liable under Article 121. *United States v. Blackshire,* [33 MJ 501] (AFCMR 1991)]; *see Watkins,* 32 MJ at 529; *United States v. Castillo,* 18 MJ 590 (NMCMR 1984).

Unpub. op. at 2–3.

## II

In pertinent part, Article 121 prescribes:

(a) Any person subject to this chapter who *wrongfully takes, obtains, or withholds,* by any means, from the possession of the owner or of any other person any money, personal property, or article of value of any kind—

> (1) with intent permanently to deprive or defraud another person of the use and benefit of property or to appropriate it to his own use or the use of any person other than the owner, steals that property and is guilty of larceny[.]

(Emphasis added). From a careful reading of the available legislative history of this provision's enactment and our case law, two things may fairly and accurately be said concerning the substance of this statute: First, the Article consolidates what had been known as common-law larceny (that is, larceny by trespass on either the actual or the constructive possession of the owner), embezzlement, and obtaining by false pretenses—no more and no less; second, within the universe of those combined offenses, however, the fine subtleties that had conceptually (if not always logically) distinguished them are not material to guilt or innocence of larceny under Article 121.[1]

## A

The 93d Article of War (AW) proscribed "[v]arious [c]rimes," including "larceny."

AW 93 further stipulated: *"Provided,* That any person subject to military law who commits larceny or embezzlement shall be guilty of larceny within the meaning of this article." App. 1, Manual for Courts–Martial, U.S. Army, 1949, at 297; App. 1, Manual for Courts–Martial, U.S. Air Forces, 1949, at 297. Paragraph 180*g* of those Manuals indicated: "Larceny, or stealing, is the unlawful appropriation of personal property which the thief knows to belong either generally or specially to another, with intent to deprive the owner permanently of his property therein.... In military law former distinctions between larceny and embezzlement do not exist."

Making reference to AW 93,[2] the Commentary that accompanied Article 121 of the proposed Uniform Code stated:

> This article is intended to combine the offenses of larceny by asportation, larceny by trick and device, obtaining property by false pretenses, and embezzlement. It is desirable to eliminate the technical distinctions which have heretofore differentiated one type of theft from another and is in keeping with modern civil trends.

Hearings on H.R. 2498 before a Subcom. of the House Armed Services Comm., 81st Cong., 1st Sess. 1232 (1949). *Accord id.* at 815 (statement of Robert D. L'Heureux, Chief Counsel, Senate Banking and Currency Committee: "Three offenses, larceny, embezzlement, and obtaining goods or money under false pretenses are now to be termed larceny.").

This Court made specific reference to this legislative history in *United States v.*

---

**1.** By combining these three forms of theft into one general statute, Article 121 is consistent with the modern trend that is designed to erase the fine-line, highly technical distinctions between the various theories—distinctions that served no useful purpose and, instead, often tended to confuse and to encourage gamesmanship under any particular set of facts. *See* W. LaFave and A. Scott, 2 *Substantive Criminal Law* § 8.8(c) at 413 (1986). For a concise discussion of the history of the development of the three separate offenses and of their modern

merging into a single generic theft offense, *see id.* § 8.1 at 327–32.

**2.** The Commentary also made reference to proposed Articles for the Government of the Navy [S. 1338 (1947)] 9(41) and (43) that would have proscribed embezzling, injuring, or destroying private property and obtaining property by false pretenses, respectively; none of the proposed articles addressed larceny generally. These proposed articles were offered to Congress in 1947 but were never passed.

*Aldridge,* 2 USCMA 330, 331–32, 8 CMR 130, 131–32 (1953):

> An examination of the legislative history of Article 121 discloses that it was the clear intent of Congress to create the single offense of "larceny," and to abolish the technical distinctions theretofore existing among the crimes of larceny, embezzlement, and taking under false pretenses. Thus, the particular means of acquisition of the property became relatively unimportant, and the critical question in each case now is the intent with which the property in question is held by the accused.... At first blush, it may appear that through the multiple use of the disjunctive [in the statute], a number of variables are presented. However, closer scrutiny demonstrates that this is not in truth the case. In *all* situations, an intent *permanently* to deprive the owner of his property is required.

(Citation omitted.) In this connection, the Court distinguished Article 121 from the scope of conduct addressed in Article 85, UCMJ, 10 USC § 885, which

> spells out three very different offenses, to wit: desertion with intent to remain away permanently, desertion with intent to avoid hazardous duty, and desertion with intent to shirk important service—each involving a separate and distinct specific intent.

In sum, then, the Court concluded:

> Basically, the Article in question requires proof of no more than two elements: (1) that the accused obtained possession of the property in question, of some value, (2) with an intent, then or thereafter conceived, permanently to deprive the true owner of its use and benefit.

*Id.* at 332, 8 CMR at 132. While this analysis might justifiably be scored for not expressly acknowledging that the taking, withholding, or obtaining of the property must be "wrongful," it otherwise certainly does seem accurately to embody the intent of Congress discussed earlier.

Again reflecting the dual characteristics of the content of Article 121—that it precisely encompasses the combined scope of common-law larceny, embezzlement, and obtaining by false pretense but does not continue the fine-line distinctions among them—the Court later that same year wrote in *United States v. Buck,* 3 USCMA 341, 343, 12 CMR 97, 99 (1953):

> By enacting Article 121(a), *supra,* Congress eliminated the oftimes subtle and confusing distinctions previously drawn between common law larceny, embezzlement, and false pretenses. *United States v. Aldridge,* 2 USCMA 330, 8 CMR 130, decided March 24, 1953; *United States v. Norris,* 2 USCMA 236, 8 CMR 36, decided February 27, 1953. The consolidation of these crimes, however, did not enlarge the scope of the statutory crime of "larceny" to include more than its components previously encompassed. Since the whole is equal to, not greater than, the sum of all its parts, that which did not constitute common law larceny, embezzlement, or false pretenses, prior to adoption of Article 121(a), *supra,* was not thereafter punishable as a violation thereof.

Later, in *United States v. Sicley,* 6 USCMA 402, 20 CMR 118 (1955), the Court was asked to consider whether, within the perimeter of Article 121, the distinctions between larceny, embezzlement, and false pretenses nonetheless remained regarding proof, as opposed merely to pleading. The Court defined the issue and then announced its answer, as follows:

> Our problem then is to decide whether the technical rules which formerly characterized the crimes of larceny, embezzlement, and taking by false pretenses—rules eliminated from court-martial pleading through codification—should nevertheless be perpetuated in determining the sufficiency of the evidence.
>
> If Article 121 had been drafted in terms of "larceny," "embezzlement," or "false pretenses," we would strongly incline toward a holding [that the technical rules are relevant to proof].

*Id.* at 408, 20 CMR at 124. Indeed, had Article 121 been so drafted, the Court might well have viewed it similarly as it

viewed the three distinct crimes of desertion under Article 85 in *Aldridge*. However,

> [s]uch a [view, given the form of Article 121,] seems to us clearly to defeat the very purpose of codification. If pre-existing technicalities are to be perpetuated through judicial affection therefor, a statute advisedly couched in general terms will be of no avail, and the path of reform legislation will be rendered thorny.

*Id.* at 409, 20 CMR at 125.

We recognize that Judge Latimer, dissenting in *Sicley*, read the majority opinion as "overrul[ing] the principles announced in *United States v. Aldridge* ...." He believed that, "[u]nder the rule of this case, it now appears that we have revived all the technical *instructional* niceties which plagued the courts before larceny, false pretenses, and embezzlement were merged into one offense." *Id.* at 414, 20 CMR at 130 (emphasis added).

As the emphasized language indicates, Judge Latimer's fears emanated from the majority's treatment of flaws in the instructions, but it appears that the majority's concerns with the instructions in that case had more to do with ensuring that the *perimeter* of Article 121—that is, the combined scope of the three foundational crimes—not be exceeded by punishing conduct under Article 121 that would not have been punished under any of the three predicate offenses. The language from the majority opinion that we set out above reassures us, despite Judge Latimer's anxiety, that the Court in *Sicley* remained of the view it originally had articulated in *Aldridge*, both as to the total scope of Article 121 and as to the legislative elimination of the technical distinctions within that scope.

The Court had a similar concern with the combined scope of Article 121 in *United States v. McFarland*, 8 USCMA 42, 23 CMR 266 (1957). There, the accused had received money from another servicemember, knowing it to have been stolen from a third soldier. In the majority opinion, the Court reviewed its analyses in *Buck* (which essentially mirrored *Aldridge*) and *Sicley*, reconciled any possible inferences of inconsistency, and made clear that Article 121 does not include conduct that could not have been reached by any of the three crimes upon which it was based. The Court did recognize the wrongful conversion theory of larceny under Article 121, but the facts of the case did not come within that theory. Instead, the majority observed, the accused might have received stolen property or he might have been an accessory after the fact. However, since neither of those crimes was included within common-law larceny, embezzlement, or false pretenses, they are not within the scope of Article 121, either.

The same vigilance as to the outer boundaries of Article 121 is reflected, as well, in our more recent opinion in *United States v. Mervine*, 26 MJ 482 (1988). There, however, the concern was not with the nature of the crime but with the object of the purported larceny. The accused had bought certain goods from the Navy Exchange under a deferred payment plan and, later, had "devise[d] a plan to deceive the Exchange into believing that he had already paid the entire amount of the debt...." The Court pointed out, though, that Article 121 protects only "money, personal property, or article of value of any kind" and recalled that "the common law required that the object of the larceny be tangible and capable of being possessed." *Id.* at 483. Accordingly, the Court held "that a debt or the amount thereof is not the proper subject of a larceny under Article 121." *Id.* at 483–84.

### B

■ Accordingly, our precedent indicates that the fundamental role of a court of military review or of this Court in a case such as this is to determine whether an accused's conduct as charged and proved could have been punished under any of the three predicate crimes encompassed by Article 121.

■ Here, for instance, Antonelli was charged with "steal[ing] more than $100.00, property of the United States." Article 121 prescribes that anyone "who wrongfully takes, obtains, or withholds" property from someone else with the requisite intent "steals that property and is guilty of larceny." Since these available theories of stealing generally address the three historical predicate crimes of Article 121, an allegation of "stealing" is a legally adequate charge under a modern theft statute such as ours. *See* W. LaFave and A. Scott, 2 *Substantive Criminal Law* § 8.8 at 409–15 (1986).

Then, to prove the charged larceny, the prosecution must show that the accused wrongfully took, obtained, or withheld the property in question with the requisite intent. While, as we just noted, these three theories of theft under Article 121 generally address the predicate crimes of that statute, *see* para. 46c(1)(b), Part IV, Manual for Courts–Martial, United States, 1984, they do not purport to maintain the fine lines between those crimes.

For instance, we recognized in *McFarland* that, when Manual for Courts–Martial, United States, 1951, correctly stated that "a withholding may arise either (1) because of a failure to account for property belonging to another where an accounting is due, or (2) as a result of having devoted property to a use not authorized by its owner," para. 200a (2) at 357, this essentially reflected the historic crimes of embezzlement and conversion. 8 USCMA at 46, 23 CMR at 270. *See* para. 46c(1)(b) and (f), Part IV, 1984 Manual, *supra*. In either instance, the accused had lawful possession at the time that he "stole" the property by wrongfully withholding it from the owner with the requisite statutory intent. *See* LaFave and Scott, *supra* §§ 8.2 and 8.6.

### III

■ In this case, the Court of Military Review concluded that "an individual who simply fails to inform authorities of an overpayment is not criminally liable." Unpub. op. at 2–3. *Cf.* LaFave and Scott, *supra* § 8.2(g) at 342. Regardless, Antonelli did more.

The certification that he signed on November 4, 1987 (Appendix), contained the following instructions at the very outset:

AFM 177–373, volume I, requires that military members recertify BAQ, VHA, and RPHA. Please complete the recertification at the bottom and reverse of this form and return it to the Accounting and Finance Office (AFO) no later than the end of next month. *Failure to recertify will result in stopping of BAQ/ VHA/RPHA and a possible retroactive collection....*

(Emphasis added.) Thereafter, Antonelli checked the box preceding the line on the form that read: "I certify that *I provided* adequate support for my dependents for the last two years...." (Emphasis added.) Additionally, though he did not check the box preceding the following line on the form, he did write in the information in the two blanks indicated: "For divorced or legally separated claiming with dependent rate BAQ on behalf of a dependent not residing with member, I certify that the monthly amount of dependent support I have provided since *76 Feb* pursuant to a court order, legal separation agreement, or other formal agreement with my former spouse is *$125.00.*"

Of course, as the court-martial found, these certifications were false. Even if, as the Court of Military Review opined, Antonelli did not commit any larceny by his mere failure to come forth and give back past payments to which he was not entitled, that money did not become *Antonelli*'s. The allowances in question were property of the United States that had been delivered to Antonelli solely to defray the financial burden of supporting a dependent child. Such an allowance is not salary and is clearly distinguishable from salary.[3] In-

---

**3.** "[T]he word 'allowances' ... refers to *benefits* of one kind or another *in addition* to regular pay...." 54 Am Jur 2d, Military and Civil De-

fense § 171 at 28 (emphasis added). In *United States v. Wooldridge*, 10 USCMA 510, 28 CMR 76 (1959) (quoting from *United States v. Ryno*, 130

asmuch as Antonelli was in fact *not* paying support for his daughter, he was not entitled to the allowances therefor; thus, those monies remained the lawful property of the United States.[4]

■ Importantly, the emphasized portion of the instructions to the certifications quoted above makes clear that these certifications were made *not* just in the context of representing his entitlement to *continued* allowances *but also* arguably in the context of frustrating an *accounting* for *previous* allowances that had been delivered to him for his daughter's support. In other words, that portion of the instructions might be evidence that appellant was being called to account for previously received allowances and might be evidence that he knew he was being called to account and failed truthfully to do so. As was expressly noted in *McFarland,* when an individual fails "to account for property belonging to another where an accounting is due," he has wrongfully withheld that property. 8 USCMA at 46, 23 CMR at 270.

Another possible interpretation of the emphasized portion of the instructions is that the certifier is being advised that, if he does not sign the certificate, subsequent action likely will be taken to determine whether collection of past payments is appropriate. In this light, Antonelli's signing the certificate that he filled out as he did might be considered as circumstantial evidence that he had wrongfully converted the previously collected money of the United States to his own use.[5]

## IV

Having discussed the foregoing legal principles in the context of this case, we now are in somewhat of a quandary in how to respond to the certified question.

The first part of that question asks whether the Court of Military Review erred in holding that funds that were wrongfully withheld had to have been unlawfully acquired. We do not read that opinion to so hold, however. In its full context, we believe that the last-quoted paragraph of the opinion set out earlier (35 MJ at 124) simply addressed, one at a time, the potential theories of larceny (35 MJ 126) under Article 121. We acknowledge, though, some latent ambiguity in this regard. Thus, if the first part of the certified question does accurately reflect the holding below, we answer that question in the affirmative: As the question interprets the court's holding, that court did err.

The second part of the certified question asks whether the Court of Military Review erred "by holding that the facts of the case do not establish a duty to account on the part of" the accused. Quite clearly, this Court may not be asked to reevaluate the *facts* of a case under the guise of a certified question. *Compare* Art. 66(c), UCMJ, 10 USC § 866(c), *with* Art. 67(c), UCMJ, 10 USC § 867(c) (1989).

We are not entirely certain, however, what is meant by the court's opinion that a duty to account was not proved by the evidence. For instance, possibly the court overlooked the potential import of the evi-

---

F. Supp 685 (SD Cal.1955), *aff'd* 232 F.2d 581 (9th Cir.1956)), this Court recognized that a "special purpose" was inherent in the payment of such benefits. With respect to this "special purpose," the court stated in *Ryno:*
> It was never the purpose of a serviceman's allotment that he be thereby personally enriched. It was the purpose of the Government to provide *currently* for the regularly recurring subsistence needs of the serviceman's family.

130 F.Supp. at 690–91.

**4.** *See also* 8 Am Jur 2d, Bailments § 2 at 738:
> A "bailment," in its ordinary legal signification, imports the delivery of personal proper-

ty[, including money, *see id.* § 4 at 740] by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it.
(Footnotes omitted.)

**5.** *See id.* § 122 at 854 ("[A]ny *unauthorized* attempt on the part of the bailee ... to transfer the title or possession of the subject matter of the bailment ... constitutes a conversion and is regarded as terminating the bailment." (Emphasis added.)).

dence of Antonelli's certification that we discussed earlier; possibly it found, even in light of that evidence, that it was insufficient to prove beyond a reasonable doubt that he had a duty then to account; possibly the court concluded that, even if the form did call upon Antonelli to account, it was not sufficiently clear in this regard so as to permit that court to conclude beyond a reasonable doubt that the accused *intended* to frustrate that accounting (*see* para. 46b(1)(d) and c(1)(f), Part IV, 1984 Manual, *supra*); or possibly the court below erred in failing to apply the relevant legal concepts to the evidence.

■ Additionally, related to this latter possibility, it would seem that a conversion theory of larceny, as discussed earlier, might apply to the evidence in this case. In this connection, though, we note that the military judge here instructed the members that

[a] "withholding" may arise as a result of a failure to return or account for property to its owner when such return or accounting is due, even though the owner has made no demand for the property. In determining whether a withholding is wrongful, you should consider

all the facts and circumstances in this case.

It is not entirely certain whether the conversion theory of wrongful withholding was presented to the members as an option under these instructions. Of course, even if it was, the question remains whether the evidence is legally and factually sufficient to support such a theory of guilt.

Under these circumstances, we believe that it is appropriate for the Court of Military Review to have the opportunity to consider further the correctness of Antonelli's conviction for the larceny in question in light of this opinion.[6]

## V

The decision of the United States Air Force Court of Military Review disapproving the larceny conviction for the period December 1, 1986, through November 3, 1987, is set aside. The record of trial is returned to the Judge Advocate General of the Air Force for remand to that court for further action consistent with this opinion.

Chief Judge SULLIVAN and Judges COX and GIERKE concur.

---

6. The Government never contended at trial that Antonelli's conduct during the time frame here in question constituted larceny by false pretense. In this Court, though, the Government does make such an assertion in the penultimate paragraph of its 18-page brief. *See generally* LaFave and Scott, *supra* § 8.7 at 397.

Under the facts of this case, however, this belated contention is ill-founded. There is no evidence at all of any representation made by Antonelli prior to his reenlistment on November 13, 1986, let alone that any representation made by him was false. *See id.* at 384 and 385; para. 46e, Part IV, Manual for Courts-Martial, United States, 1984. In any event, since the prosecution's theory of this larceny was wrongful *withholding* and since that is the theory upon which the military judge instructed the members, the

members never found—because they were never asked to find—that Antonelli wrongfully *obtained* the allowances here in question by making a representation of fact that he knew to be untrue. *Cf. United States v. Wray*, 17 MJ 375 (CMA 1984) (conviction under a wrongful-withholding theory of larceny could not stand where the Government's case was based on a wrongful-taking theory of larceny). The fact that Congress, in enacting Article 121, Uniform Code of Military Justice, 10 USC § 921, made technical distinctions between different forms of larceny largely irrelevant for pleading and proof does not mean that the members do not require meaningful guidance in the military judge's instructions as to what they must find in order to convict under the available statutory theories of taking, obtaining, or withholding.

APPENDIX

RECERTIFICATION OF BASIC ALLOWANCE FOR QUARTERS (BAQ) — VARIABLE/RENT PLUS HOUSING ALLOWANCE (VHA/RPHA)
*(This form is subject to the Privacy Act of 1974 - See Reverse)*

AFM 177-373, volume I, requires that military members recertify BAQ, VHA, and RPHA. Please complete the recertification at the bottom and reverse of this form and return it to the Accounting and Finance Office (AFO) no later than the end of next month. Failure to recertify will result in stopping of BAQ/VHA/RPHA and a possible retroactive collection. If you have any questions, or are unsure of how to complete the form, you should visit your local AFO who will assist you. Thank you for your cooperation.

**RECERTIFICATION OF DEPENDENTS/SHARERS** *(Continue on reverse)*

☒ I certify that I provided adequate support for my dependents for the last two years/since arrival on station (line one out) to present, and neither my dependents nor I occupied government quarters during the same period.

☐ For divorced or legally separated claiming with dependent rate BAQ on behalf of a dependent not residing with member: I certify that the monthly amount of dependent support I have provided since __76 Feb__ *(year - month)* pursuant to a court order, legal separation agreement, or other formal agreement with my former spouse is $__125.00__.

☐ For overseas VHA - I certify that I do/do not *(line one out)* have dependents residing in the local area.

☐ For rent plus - I certify the following statements to be true as indicated:
  ☐ My rent currently being paid has/has not *(line one out)* changed since my present tour of assignment began.
  ☐ My rental lease is effective _____ *(YYMMDD)* and expires _____. Rental address is _____
  The amount *(stated in currency paid)* of my current rent is _____, being paid in _____ *(state currency)*, and utilities are/are not *(line one out)* included in my rent. I am/am not *(line one out)* sharing rent with anyone other than my immediate family. If yes, how many others? _____.
  Landlord's name, address and telephone number is _____

I will immediately report any changes to Housing that might affect my VHA/RPHA, and to the AFO and CBPO on status of dependents claimed on reverse of this form, such as divorce, child support, marriage, death, living in government quarters, enlistment in the military service, etc. I certify that the information given regarding this recertification is correct.
**IMPORTANT:** Making a false statement or claim against the US Government is punishable by court martial. The penalty for willfully making a false claim or a false statement in connection with a claim is a maximum fine of $10,000 or imprisonment for 5 years, or both.

| DATE | SIGNATURE | SOCIAL SECURITY NUMBER |
|---|---|---|
| 4 NOV 87 | *Anthony M. Antonelli* | 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 |

AF FORM 987, Nov 84    PREVIOUS EDITION IS OBSOLETE

— Back —

PRIVACY ACT STATEMENT

**AUTHORITY:** 37 U.S.C. 403, E.O. 9397, Nov 1943.

**PRINCIPAL PURPOSE(S):** To recertify, adjust or terminate military member's entitlement to basic allowance for quarters.

**ROUTINE USES:** To adjust member's military pay record. Information may be disclosed to AF components such as AFAFC, Major Commands, and other AF installations; to other DOD Components such as Army and Navy, other Federal Agencies such as IRS, Social Security Administration and VA, GAO, Members of Congress, State and Local Governments, US and State Courts and various law enforcement agencies. SSN is used for positive identification.

**DISCLOSURE IS VOLUNTARY:** Nondisclosure may result in termination of your basic allowance for quarters. Disclosure of your SSN is voluntary, but this form will not be processed without it since the Air Force identifies you by your SSN.

**DEPENDENTS/SHARERS**

| NAME OF DEPENDENT/SHARER | COMPLETE CURRENT ADDRESS *(Include ZIP code)* | RELATIONSHIP | DOB OF CHILDREN |
|---|---|---|---|
| Jennifer C. Antonelli | 161 Tahoe Pl. San Rafael, CA 94903 | Daughter | 20 JAN 74 |

*Reverse of AF FORM 987, Nov 84)*

☆ U.S. GPO 1984—440-983/23271

CRAWFORD, Judge (concurring in the result):

In Article 121, Uniform Code of Military Justice, 10 USC § 921, Congress plainly prescribed:

(a) Any person subject to this chapter who wrongfully ... withholds, by any means, from the possession of the owner or of any other person any money, personal property, or article of value of any kind—

(1) with intent permanently to deprive or defraud another person of the use and benefit of property or to appropriate it to his own use or the use of any person other than the owner, steals that property and is guilty of larceny[.]

(Emphasis added.)

Notwithstanding Congress' clear language, the majority opinion insists, based upon what at best could be called fragmen-

tary legislative history,* that the language of the statute may mean something entirely different from what is expressed. Thus the majority concludes that one can only be guilty of Article 121 larceny if one would have been guilty of the old common law offenses of larceny by trespass, embezzlement, or obtaining by false pretenses, as articulated in the forerunner to the UCMJ.

In any event, common law larceny includes the mistaken delivery of property. W. LaFave & A. Scott, *Substantive Criminal Law* § 8.2(g) at 342–43 (1986). It includes an individual who mistakenly receives an allowance and realizes his or her mistake at the moment *and* forms the intent to steal the property. *Id.* Of course, an individual who does not realize the mistake, such as overpayment for a complicat-

ed travel voucher, would not be guilty of larceny. But if the individual later learns of the mistake and has the requisite intent, there may be larceny. There is a "fictional notion of continuing trespass" to find the taking-and-asportation element. *Id.* § 8.5(f) at 366. It is unnecessary to decide whether this continuing-trespass notion applies in this case or whether a later-formed intent would be sufficient. *Id.* at 367.

The opinion of the Court of Military Review (quoted by the majority—35 MJ at 123–24) bears the same defect as the majority opinion. I would reverse the decision below and remand for a determination of whether the elements of wrongful withholding, as described in the Uniform Code of Military Justice and as charged in this case, were established.

---

* The commentary, quoted in its entirety in the majority opinion, 35 MJ at 124, in no way expresses the view that Article 121 includes only certain common law offenses "no more and no less." *Id.* at 124. I agree that the language suggests an amalgamation under one article of formerly distinct offenses and a rejection of technical distinctions between them. But nothing in the commentary indicates exclusivity or an intent to override the elements of the *newly crafted* statute.