UNITED STATES, Appellee

v.

**Samuel T. HELMS, II, Airman First Class, U.S. Air Force, Appellant.**

No. 96–1167.
Crim.App. No. 31250.

U.S. Court of Appeals for
the Armed Forces.

Argued April 9, 1997.

Decided Aug. 28, 1997.

Certiorari Denied Jan. 12, 1998.
See 118 S.Ct. 698.

For Appellant: *Major Ormond R. Fodrea* (argued); *Lieutenant Colonel Kim L. Sheffield* (on brief); *Colonel Jay L. Cohen.*

For Appellee: *Captain Mitchel Neurock* (argued); *Colonel Theodore J. Fink* (on brief); *Major LeEllen Coacher.*

*Opinion of the Court*

CRAWFORD, Judge:

A military judge sitting as a general court-martial at Rhein–Main Air Base, Germany, found appellant guilty of larceny of military property, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. The convening authority approved the sentence of a bad-conduct discharge, confinement for 10 months, reduction to the lowest enlisted grade, and a reprimand. The Court of Criminal Appeals affirmed the findings and the sentence in an unpublished opinion.

We granted review of the following issue:

WHETHER THE FACTS ARE LEGALLY SUFFICIENT TO SUPPORT A CONVICTION OF LARCENY OF BAQ AND OHA PAYMENTS.

We hold that the facts are legally sufficient to support appellant's larceny conviction under the standard established in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

## FACTS

On assignment in Germany, appellant lived off base and received a basic allowance for quarters (BAQ) and an overseas housing allowance (OHA). He subsequently requested a move into government quarters. Standard procedure was for the housing representative to process the paperwork to stop the housing allowances. For some reason, appellant's housing allowances did not end when he entered government housing. Despite his move to on-base housing, appellant continued to receive both BAQ and OHA for 11 months. He was overpaid more than $11,000.

At trial, Sergeant (Sgt) Sykes, the NCOIC of Customer Service in the Accounting and Finance Office, testified that she saw appellant's wife at a track meet during the summer of 1993 and that appellant's wife said "her husband felt that they were being overpaid" for housing. According to Sgt Sykes, appellant was present during part of this conversation, and she advised him to stop by her office to find out if he was being overpaid. She testified as follows:

A. I told Airman Helms that I needed him to come in so I could verify if he was, in fact, being overpaid; how much he was being overpaid; and at that point, I could figure out a repayment schedule so that it wouldn't put him into much of a financial bind.

Q. What, if anything, did he say to you when you tell [sic] him this?

A. He said, "Okay."

Q. Did he indicate to you when he would follow up with repaying these overpayments?

A. No. He didn't indicate when. My statement was that when we got back, that he should come in and see me and then we could figure out a way to repay.

Q. Did either Airman Helms or his wife ever come in to see you?

A. No.

Appellant's wife testified that she took over the family financial matters when they moved into government quarters. She stated that appellant never saw his leave and earnings statements and that she took care of paying all of the bills. Mrs. Helms acknowledged that she had a conversation with Sgt Sykes about a possible overpayment but contended that appellant was standing about 75 feet away from them during the conversation. Mrs. Helms testified that she may not have remembered to tell appellant to go to the finance office as Sgt Sykes had directed.

Appellant's continued receipt of housing allowances was discovered when he began providing information for a recertification form while preparing to separate from the Air Force. Appellant informed the separation and retirement technician, Sgt Enlow, that he was living in government housing. Sgt Enlow discovered that appellant had been receiving housing allowances and told appellant that he had been overpaid and would have to repay the money or put in a request for a waiver. Appellant did not seem surprised by the news and made no comment. Sgt Enlow then asked appellant how he would like to handle the situation, and appellant said that he had to think about it. Sgt Enlow testified that he told appellant to let the finance office know as soon as possible, preferably, that very day.

## DISCUSSION

■ This Court has applied the benchmark test for legal sufficiency established in *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789. "The test for ... [legal sufficiency of the evidence] is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 MJ 324 (CMA 1987), citing *Jackson, supra* at 319, 99 S.Ct. at 2789. Writing in *United States v. Harper*, 22 MJ 157, 161 (CMA 1986), then-Judge Cox stated, "In this context, sufficient evidence generally means some legal and competent evidence from which a court-martial may find or infer beyond a reasonable doubt those facts required by law for conviction." *See also United States v. Pritchett*, 31 MJ 213, 216 (CMA 1990).

Until now, this Court has reserved the question of whether "a servicemember who accepts found money and who does nothing to correct the continued cash flow is not criminally liable...." *United States v. Antonelli*, 43 MJ 183, 185 (1995), citing *United States v. Antonelli*, 35 MJ 122, 130–31 (CMA 1992)(Crawford, J., concurring in the result). However, we have made clear that "any *affirmative* action either to ensure the inappropriate continuation of the elevated allowances or to mislead officials in a way so as to co-opt a recoupment has more than civil-indebtedness ramifications." *Antonelli*, 43 MJ at 185.

The mistaken delivery of property to an individual who realizes the mistake and simultaneously forms the intent to steal the property at the moment of receipt constitutes larceny at common law. W. LaFave & A. Scott, 2 *Substantive Criminal Law* § 8.2(g) at 342–43 (1986). Furthermore, where the individual does not realize the mistake at the time of receipt but realizes it later and then forms the requisite intent, there is a larceny as well. Para. 46c(1)(f)(i), Part IV, Manual for Courts–Martial, United States (1995 ed.)("Although a person gets property by a taking or obtaining which ... was without a concurrent intent to steal, a larceny is nevertheless committed if an intent to steal is formed after the taking or obtaining and the property is wrongfully withheld with that intent."); *United States v. Aldridge*, 2 USCMA 330, 8 CMR 130 (1953); *United States v. Cox*, 37 MJ 543 (NMCMR 1993); *see also State v. Langford*, 467 So.2d 41 (La.App. 4th Cir.1985). This latter larceny relies on the "fictional notion of *continuing trespass*" to find the concurrent existence of the taking element and the requisite intent. *LaFave & Scott, supra*, § 8.5(f) at 366.

■ We now hold that once a servicemember realizes that he or she is erroneously receiving pay or allowances and forms the intent to steal that property, the servicemember has committed larceny. Thus, the analysis in this case must focus on whether the evidence is legally sufficient to establish that appellant (1) realized he was mistakenly receiving housing allowances and (2) formed an intent to steal it. Giving proper deference to the military judge and the Court of Criminal Appeals, as well as viewing the evidence in the light most favorable to the Government, we hold that the evidence is legally sufficient to support appellant's conviction for larceny.

Sgt Sykes testified that appellant was present when she and Mrs. Helms discussed appellant's possible overpayment. In fact, she testified that she spoke directly to appellant and informed him to visit her at the finance office so that they could straighten the matter out. When Sgt Enlow told appellant that he had been overpaid, appellant did not appear surprised. The Court of Criminal Appeals, which has factfinding authority under Article 66(c), UCMJ, 10 USC § 866(c) (1994), was "convinced that appellant knew he was receiving these allowances and was not entitled to them." Unpub. op. at 3. The lower court also noted that the more than $11,000 in housing allowances which appellant received amounted to about 40% of his pay. *Id.* Viewing this evidence in the light most favorable to the prosecution, a reasonable factfinder could have found beyond a reasonable doubt that appellant realized he was receiving unauthorized housing allowances.

The evidence is also legally sufficient to establish that appellant formed an intent to steal the housing allowances. The Court of Criminal Appeals found Sgt Sykes' testimony that she advised appellant to stop by the finance office credible. That court also found that appellant's failure to follow Sgt Sykes' advice was an "affirmative action designed to ensure the continuation of the allowances which he was not entitled to receive." *Id.* We agree. A reasonable factfinder could find that appellant's inaction, in light of Sgt Sykes' recommendation, constituted evidence of an "intent permanently to deprive or defraud another person of the use and benefit of property or to appropriate it to his own use ...," which is required for a larceny conviction under Article 121(a)(1).

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges SULLIVAN, GIERKE, and EFFRON concur.